924 A.2d 308

**John August PAULINO**

v.

**STATE of Maryland.**

**No. 75, Sept. Term, 2006.**

Court of Appeals of Maryland.

June 4, 2007.

Allison E. Pierce, Asst. Public Defender (Nancy S. Forster, Public Defender, on brief), for petitioner.

Edward J. Kelley, Asst. Atty. Gen. (Douglas F. Gansler, Atty. Gen., on brief), for respondent.

Argued before BELL, C.J., RAKER, CATHELL, HARRELL, BATTAGLIA, GREENE and ALAN M. WILNER (Retired, Specially Assigned), JJ.

GREENE, J.

This case requires us to consider whether a search conducted incident to an arrest is reasonable under the Fourth Amendment in light of the manner and place in which the search was conducted at a time when there were no exigent circumstances justifying the immediate search. We conclude that, under the circumstances of this case, the search of petitioner was unreasonable. Accordingly, we shall reverse the judgment of the Court of Special Appeals.

## I.

### Factual and Procedural Background

On September 29, 2000 Detective Elliot Latchaw, and other members of the Baltimore County Police Department received information from a confidential informant who told them that later that evening petitioner, John August Paulino ("Paulino"), would be in the 1100 block of North Point Road, Dundalk, Maryland, and would be in possession of a quantity of controlled dangerous substance. The informant also advised the police that Paulino typically hides the controlled dangerous substance in the area of his buttocks. Acting on the information provided by the informant, the police established surveillance in the 1100 block of North Point Road. At the suppression hearing, Detective Latchaw described the surveillance in greater detail:

[Detective Latchaw]: He actually—we had surveillance established on the parking lot, and he was actually observed on the parking lot, and he was actually observed by myself as they pulled into the entrance to the car wash. He was seated in the passenger seat. I saw him clear as day, and I radioed real quick to everybody, this is him, he's in the passenger seat. And at that time, they actually pulled [into one of] the bays of the car wash. There's like maybe six or eight bays all away across in the line. When they pulled in, they were blocked in, and he was removed from the vehicle. And I don't know exactly how he was taken out of the vehicle or if he got out on his own, I don't know, because at that point, I was back a little ways coming up. There was a—there was a team to do all that.

\* \* \* \* \* \*

There was also testimony describing the location of the search:

[Defense Counsel]: Is that area of Dundalk fairly busy at that time of night?

[Detective Latchaw]: Not at all. Its actually—the car wash is actually back—you pull into a parking lot, and you've got to go past an entrance to a storage facility, like those little mini storage buildings, and actually go past a—like an auto repair center. And then at the very end of this little parking lot, it's kind of like a zigzaggy entrance. Driveway kind of turns around to the left and comes back to the right, and the very back is the car wash all by itself. It's real secluded back there actually.

[Defense Counsel]: Were there any other people back there at that time around eleven-fifteen that evening other than yourself and Mr. Paulino?

[Detective Latchaw]: No, not that I—not that I can remember.

[Defense Counsel]: Yourself—

[Detective Latchaw]: Well, other units of Baltimore County Police. Right.

[Defense Counsel]: No civilian personnel?

[Detective Latchaw]: No. Nobody was washing their cars, that I can remember.

[Defense Counsel]: Is that a lighted area, dark area?

[Detective Latchaw]: Well lit.

[Defense Counsel]: Is that viewable by people in the area walking by or not really?

[Detective Latchaw]: No. No, it's way back. It's back off the road. It's real secluded.

\* \* \* \* \* \*

The testimony regarding the police officer's subsequent actions is less clear:

[Defense Counsel]: And you did conduct a search then, is that correct? How did you come to find the drugs?

[Detective Latchaw]: Well, when we—when Mr. Paulino was removed from the vehicle and laid on the ground, his pants were already pretty much down around his—below his butt, because I guess that's the fad, these guys like wearing their pants down real low, so it was just a matter of lifting up his shorts, and—and between his butt cheeks the drugs were—I believe one of the detectives actually put on a pair of gloves and just spread his cheeks apart a little bit and it was right there.

[Defense Counsel]: So they were not visible before you actually spread his cheeks apart, is that correct?

[Detective Latchaw]: I don't think they were.

\* \* \* \* \* \*

Paulino offers a slightly different version of the facts concerning the search:

[Defense Counsel]: Where was the search conducted?

[Mr. Paulino]: Inside a car wash

[Defense Counsel]: In the presence of other people or by yourself?

[Mr. Paulino]: Other people was around. It was about 12 other officers.

[Defense Counsel]: At that time, your—your anal cavity was searched. Is that correct?

[Mr. Paulino]: They had searched me in my pockets, didn't find nothing, and eventually, they came to the subject where—in my report, it states that the officer said, Mr. Paulino, why is your butt cheeks squeezed? And in further response, I said nothing. He said it again, and another officers come behind with gloves and pulled my pants down and went in my ass. Well, my cheeks. Sorry about that.

Paulino was charged with possession with intent to distribute cocaine and possession of cocaine. Subsequent to his arrest, Paulino filed a motion to suppress, which, following a hearing on the motion, was denied. Proceeding on an agreed statement of facts, the trial judge found Paulino guilty of possession with intent to distribute, and sentenced him as a subsequent offender, to a mandatory ten-year sentence.

On September 12, 2003, Paulino filed a petition for post conviction relief. The post conviction court granted Paulino the right to file a belated appeal. Paulino, in turn, filed a notice of appeal. Thereafter, in an unreported opinion, the Court of Special Appeals affirmed the judgment of the Circuit Court. On August 21, 2006, Paulino filed a petition for writ of certiorari, which we granted.[1] *John August Paulino v. State of Md.*, 395 Md. 420, 910 A.2d 1061 (2006).

## II.

### Standard of Review

We are asked in this appeal to review the Circuit Court's denial of Paulino's motion to suppress. "Our review of a circuit court's denial of a motion to suppress evidence,

---

1. Petitioner presents the following question for review:

    Did the search of Petitioner, which involved an officer putting on plastic gloves and spreading the cheeks of Petitioner's buttocks to reveal drugs which were not visible before that time, violate the Fourth Amendment, when the search was conducted in the parking lot of a car wash in the presence of individuals other than the searching officer?

ordinarily, is limited to the evidence presented at the suppression hearing. *See Ferris v. State,* 355 Md. 356, 368, 735 A.2d 491, 497 (1999). Thus, we refrain from engaging in *de novo* fact-finding and looking at the trial record for supplemental information." *Carter v. State,* 367 Md. 447, 457, 788 A.2d 646, 651 (2002). We view the evidence presented at the hearing on Paulino's motion to suppress, and all reasonable inferences drawn from that evidence, in the light most favorable to the State. *See Carter,* 367 Md. at 457, 788 A.2d at 651; *Scott v. State,* 366 Md. 121, 143, 782 A.2d 862, 875 (2001); *Riddick v. State,* 319 Md. 180, 183, 571 A.2d 1239, 1240–1241 (1990).

■ It is well established that the State has the burden of proving the legality of a warrantless search and seizure. *See Sifrit v. State,* 383 Md. 77, 114, 857 A.2d 65, 86 (2004) ("[t]he ultimate burden of proving that evidence seized without a warrant should not be suppressed falls on the State" (quoting *State v. Green,* 375 Md. 595, 826 A.2d 486 (2003))); *State v. Bell,* 334 Md. 178, 191, 638 A.2d 107, 114 (1994)(noting that warrantless searches are presumptively unreasonable and that "the burden of proving the applicability of an exception to the warrant requirement rests on the State"); *Stackhouse v. State,* 298 Md. 203, 217, 468 A.2d 333, 341 (1983) (emphasizing "that the burden of establishing exigent circumstances is on the State and that the facts and circumstances upon which the question of reasonableness depends must be viewed in light of established Fourth Amendment principles"). *See also Coolidge v. New Hampshire,* 403 U.S. 443, 455, 91 S.Ct. 2022, 2032, 29 L.Ed.2d 564, 576 (1971) (holding that "there must be a showing by those who seek exemption [from the requirements of the Fourth Amendment] that the exigencies of the situation made that course imperative. The burden is on those seeking the exemption to show the need for it.").

■ As this Court noted in *State v. Nieves,* 383 Md. 573, 581–82, 861 A.2d 62, 67 (2004), "[a]lthough we extend great deference to the hearing judge's findings of fact and will not disturb them unless clearly erroneous, we review, independently, the application of the law to those facts to determine if

the evidence at issue was obtained in violation of the law and, accordingly, should be suppressed."

## III.

## Discussion

## A.

*Fourth Amendment and Search Incident to Arrest*

■ In support of his challenge to the validity of the search, Paulino relies on the Fourth Amendment to the United States Constitution. The Fourth Amendment provides:

> The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no warrants shall issue, but upon probable cause, supported by Oath or affirmation and particularly describing the place to be searched and the persons or things to be seized.

U.S. Const. amend. IV. The Fourth Amendment is made applicable to Maryland through the Fourteenth Amendment, and prohibits searches that are "unreasonable under the circumstances." *Nieves*, 383 Md. at 583, 861 A.2d at 68. In *Nieves*, we noted that "it is well established that warrantless searches are *per se* unreasonable under the Fourth Amendment absent some recognized exception." 383 Md. at 583, 861 A.2d at 68. *See also Illinois v. Rodriguez*, 497 U.S. 177, 185, 110 S.Ct. 2793, 2799, 111 L.Ed.2d 148, 156–57 (1990). The Supreme Court of the United States has, however, recognized the authority of the police to search an arrestee incident to a lawful arrest, *see United States v. Robinson*, 414 U.S. 218, 224–26, 94 S.Ct. 467, 471, 38 L.Ed.2d 427, 434 (1973); as have we, *State v. Evans*, 352 Md. 496, 516, 723 A.2d 423, 432–33 *cert. denied*, 528 U.S. 833, 120 S.Ct. 310, 145 L.Ed.2d 77 (1999).

■ In *Evans*, 352 Md. at 515, 723 A.2d at 432, we held that to execute a lawful arrest "a police officer must have probable cause to believe the suspect has committed a felony and must either physically restrain the suspect or otherwise subject the

suspect to his or her custody and control." Because Paulino does not challenge the validity of his arrest, the only issue before the Court is the scope of the search under the circumstances.[2]

■ Police are allowed to conduct a search incident to an arrest in order "to remove any weapons that the [arrestee] might seek to use in order to resist arrest or effect his escape ... [or] to search for and seize any evidence on the arrestee's person in order to prevent its concealment or destruction." *Chimel v. California,* 395 U.S. 752, 763, 89 S.Ct. 2034, 2040, 23 L.Ed.2d 685, 694. In *United States v. Robinson,* 414 U.S. 218, 94 S.Ct. 467, 38 L.Ed.2d 427 (1973), the Supreme Court explained the scope of a search incident to an arrest in light of its decision in *Chimel.* The issue before the Court in *Robinson* was whether after a custodial arrest, a police officer could conduct a full search of the arrestee or, in the alternative, if the scope of a search incident to arrest is limited to a frisk of the outer clothing. The Court held that a search of an arrestee's waist, pants, pockets, as well as the contents of the arrestee's pockets, supports "the need to disarm the suspect in order to take him into custody" as well as "the need to preserve the evidence on his person for later use at trial" and is therefore permissible under Fourth Amendment law. *Robinson,* 414 U.S. at 234, 94 S.Ct. at 476, 38 L.Ed.2d at 440.

The rationale of *Chimel* and *Robinson* entitles the police, under the Fourth Amendment, to conduct a full search incident to arrest, without a warrant, so long as the search does not involve a bodily intrusion. *See Schmerber v. California,* 384 U.S. 757, 769, 86 S.Ct. 1826, 1835, 16 L.Ed.2d 908, 919

---

**2.** It remains unclear whether Paulino's pants were below his waist as a result of his removal from the vehicle in the course of the arrest, or, whether Paulino intentionally wore his pants below his waist as a part of a fad. Even if Paulino intentionally wore his pants below his waist and his undergarments were exposed, we conclude that because Paulino's pants were below his waist he retained, nevertheless, a Fourth Amendment right to privacy in his person. *See generally United States v. Dorlouis,* 107 F.3d 248 (4th Cir.1997); *Bell v. Wolfish,* 441 U.S. 520, 99 S.Ct. 1861, 60 L.Ed.2d 447 (1979).

*(1966).* In *Schmerber,* the Court held that the Fourth Amendment protects an arrestee's privacy interests in his person and prohibits bodily intrusions that "are not justified in the circumstances, or which are made in an improper manner." 384 U.S. at 768, 86 S.Ct. at 1834, 16 L.Ed.2d at 918. We note, however, as we did in *Nieves, supra,* that "the Supreme Court has not [specifically] addressed the validity of strip searches incident to an arrest." 383 Md. at 585, 861 A.2d at 69. *See Illinois v. Lafayette,* 462 U.S. 640, 103 S.Ct. 2605, 77 L.Ed.2d 65 (1983).

Notwithstanding the Supreme Court's failure to address the validity of strip searches incident to an arrest, we acknowledged in *Stackhouse, supra,* that "the rule developed in *Chimel* was based on an exigency rationale, that is, the safety of the officer and the preservation of evidence[,]" and that "[t]he justification, however, remains a narrow one." *Stackhouse v. State,* 298 Md. at 211–212, 468 A.2d at 338. In addition, we explained that a warrantless search cannot be justified on the basis that the officers had probable cause, "because that is the very determination for which the constitution requires a warrant hearing." *Stackhouse,* 298 Md. at 219, 468 A.2d at 342.

Here the police had reason to believe that Paulino carried drugs on his person and under his clothing, but that fact was not the justification for the search. Paulino's arrest served as justification for the search *incident* and the underlying probable cause for his arrest was never challenged. The actual challenge, however, is to the search of Paulino. He contends that the search constituted a strip search. By definition a strip search involves a more invasive search of the person as opposed to a routine custodial search. Therefore, the necessity for such an invasive search must turn upon the exigency of the circumstances and reasonableness. Without the constitutional safeguards of exigent circumstances and reasonableness, every search incident could result in a strip search. As we have said, "[t]he meaning of exigent circumstances is that the police are confronted with an emergency—circumstances so imminent that they present an urgent and compelling need for police action." *Stackhouse,* 298 Md. at 219–220, 468 A.2d

at 342.   Therefore, we must determine whether the circumstances of the search in the present case rise to that level.

## B.

### *Strip Searches and Body Cavity Searches*

■   Paulino contends that, at a minimum, the search conducted here was a strip search.   In Paulino's view, the search "was more intrusive than a mere strip search" because the cheeks of his buttocks were manipulated by the police.   Paulino asserts that "by spreading apart the cheeks of [his] buttocks" the search was beyond the realm of a strip search and, instead, was a "visual body cavity search."   In response, the State contends that the search of Paulino occurred "without removing any of Paulino's clothing" and that the "search arguably did not ... constitute a 'strip search.'"   Further, according to the State, "the police action ... did not constitute a visual or manual 'body cavity search'" because, to retrieve the contraband, the police officers only lifted up Paulino's shorts.   For reasons discussed, *infra,* we conclude that the search of Paulino was both a strip search and a visual body cavity search.

■   There exist three separate categories of searches. As the United States Court of Appeals for the First Circuit noted in *Blackburn v. Snow,* 771 F.2d 556 (1st Cir.1985), n. 3.:

A "strip search," though an umbrella term, generally refers to an inspection of a naked individual, without any scrutiny of the subject's body cavities.   A "visual body cavity search" extends to a visual inspection of the anal and genital areas. A "manual body cavity search" includes some degree of touching or probing of body cavities.

*See Nieves,* 383 Md. at 586, 861 A.2d at 70 [3] (acknowledging that a strip search is "any search of an individual requiring

---

**3.**   In accord, one attorney commentator, William J. Simonitsch, notes that there are "three distinct categories" of body cavity searches: strip searches, visual body cavity searches and manual body cavity searches. Mr. Simonitsch defines a strip search as involving the removal of

the removal or rearrangement of some or all clothing to permit the visual inspection of the skin surfaces of the genital areas, breasts, and/or buttocks." The Court noted that "[t]here is a distinction between a strip search and other types of searches, such as body cavity searches, which could involve visually inspecting the body cavities or physically probing the body cavities"); *McGee v. State*, 105 S.W.3d 609, 615 (Tex. Crim.App.2003) (holding that when the arrestee was forced to drop his pants, bend over, and spread his buttocks and the crack cocaine recovered was in plain view and was lodged between the arrestee's buttocks, the search was a visual body cavity search); *Hughes v. Commonwealth of Va.*, 31 Va.App. 447, 524 S.E.2d 155, 159 (2000) (holding that the arrestee was subjected to all three types of searches when the arrestee was disrobed, directed to bend over and expose his anus, cough in order to expand the officer's view of the anus, and when a plastic bag was subsequently removed from the arrestee's anal cavity). *See also Amaechi v. West*, 237 F.3d 356, 363–64 (4th Cir.2001); *United States v. Dorlouis*, 107 F.3d 248, 256 (4th Cir.1997); *United States v. Vance*, 62 F.3d 1152, 1156 (9th Cir.1995).

Based upon the record before us, we conclude that the police officers' search of Paulino was both a strip search and a visual body cavity search. It appears that the police officers attempted to manipulate Paulino's clothing in such a manner that his buttocks could be more readily viewed. In this instance, the police did not only lift up Paulino's shorts, but also the officers manipulated his buttocks to allow for a better view of his anal cavity. If, in the case *sub judice*, the drugs

---

clothing for inspection of the under clothes and/or body and "includ[ing] only those searches that do not involve a visual or manual inspection of the genitals or anus"; visual body cavity search "include[s] only searches where there is a visual inspection of a person's genitals or anus, but no physical contact or intrusion"; manual body cavity search includes "not only those [searches] performed by insertion of, or manipulation with, the fingers, but also endoscopic examinations and the use of gynecological devices." William J. Simonitsch, *Visual Body Cavity Searches Incident to Arrest: Validity Under the Fourth Amendment*, 54 U.Miami L.Rev. 665, 667–68 (2000).

were protruding from between the cheeks of Paulino's buttocks and visible without spreading his buttocks cheeks, the classification of the type of search would be a close one[4]. In this case, however, the drugs were not visible until after the cheeks of Paulino's buttocks were spread apart. Therefore, when the police officers spread the cheeks of Paulino's buttocks to inspect his anal cavity and, upon doing so, observed a plastic bag containing drugs, their conduct amounted to a "visual body cavity search."[5]

## C.

### *Reasonableness*

Notwithstanding the search incident to arrest exception to the warrant requirement, the search conducted by the police must be reasonable in light of the exigencies of the moment. *See,* U.S. Const. amend. IV.; *Nieves,* 383 Md. at 583, 861 A.2d at 68. The fact that the police can lawfully initiate the search of a suspect does not then give the police carte blanche authority to conduct an unreasonable search. *See Bell v. Wolfish,* 441 U.S. 520, 558, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447, 481 (noting that "[t]he Fourth Amendment prohibits only unreasonable searches"). The United States Supreme Court's decision in *Bell* sets forth the appropriate test for determining the reasonableness of a search. Judge Battaglia, writing for this Court in *Nieves, supra,* said that:

---

4.  The dissent seeks to adopt a definition of strip search that is unduly restrictive. The application of that definition underestimates the degree to which the search invaded Paulino's personal privacy. Moreover, the cases cited by the dissent in support of its contention that the search of Paulino was a "reach-in" search are distinguishable because they do not relate to the manipulation of the intimate parts of a suspect's person.

5.  As the Texas Court of Criminal Appeals noted in *McGee v. State,* 105 S.W.3d 609, 616 (Tex.Crim.App.2003), "[v]isual body-cavity searches are among the most intrusive of searches. Its intrusiveness 'cannot be overstated.' "; *United States v. Lilly,* 576 F.2d 1240, 1246 (5th Cir. 1978); *Patterson v. State,* 598 S.W.2d 265, 269 (Tex.Crim.App.1980); *Kennedy v. Los Angeles Police Dep't,* 901 F.2d 702, 711 (9th Cir.1989).

In *Bell [ ]*, "the Supreme Court addressed the permissible scope of searches incident to arrest that occurred in association with pretrial detention." [441 U.S.] at 523, 99 S.Ct. at 1866, 60 L.Ed.2d at 458. Several defendants brought a class action suit challenging detention policies requiring pretrial detainees to be subjected to a "visual body cavity" search every time the detainee had contact with individuals outside of the institution. *Id.* The Court assessed the reasonableness of these searches by stating:

> The test of reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted.

383 Md. at 588, 861 A.2d at 71.

In the present case, the Court of Special Appeals concluded that three "of the four factors required to be balanced by *Bell* ... all weigh in favor of the State." The appearance that three out of four factors weigh in favor of the State, however, does not, in and of itself, make a search reasonable. In our view, *Bell* requires a flexible approach, one that takes into account the relative strength of each factor. Further, *Bell* requires that a reviewing court, when assessing the reasonableness of a search under the Fourth Amendment, balance "the need for a particular search against the invasion of personal rights that the search entails." *Bell*, 441 U.S. at 559, 99 S.Ct. at 1884, 60 L.Ed.2d at 481. In that regard, we conclude that, on balance, the location of the search and the lack of exigency made the search of Paulino unreasonable.

Accordingly, we turn first to the scope of the search in the instant case. Paulino contends that "the scope of the intrusion involved in the [search of his person] was great[,]" noting that he had to "suffer the indignity of having an officer view his naked body" as well as having to "endure the humiliation of

having an officer physically manipulate his buttocks." The State makes no specific argument regarding the scope of the search, other than that the " 'intrusion' into Paulino's buttocks cheeks area" was reasonable. The Court of Special Appeals held that the scope of the search was reasonable because the police "only had to 'lift up' [Paulino's] shorts briefly" and that "the entire search was as brief as possible." Even if we were to assume that the amount of time to conduct the search was brief, that factor, in our view, does not render the search reasonable under the circumstances where there was no exigency.

To determine reasonableness, we look to each of the factors delineated in *Bell*, and, after balancing each of the four factors, we make a determination of reasonableness. *See Bell*, 441 U.S. 520 at 559, 99 S.Ct. at 1884, 60 L.Ed.2d at 481. We hold that the police officers' search of Paulino was highly intrusive and demeaning. The type of search that Paulino was subjected to, and other searches that "entail[ ] the inspection of the anal and/or genital areas have been accurately described as demeaning, dehumanizing, undignified, humiliating, embarrassing, repulsive, degrading, and extremely intrusive of one's personal privacy." *West*, 87 F.Supp.2d at 565.

We turn next to the second factor in the *Bell* analysis, justification for initiating the search. The State contends that there was justification for initiating the search "because the police had sufficient cause to believe that the illegal narcotics Paulino was known to be possessing were actually being concealed in that place." Citing our decision in *Nieves, supra*, the State argues that the "authority to conduct a search of this scope is virtually unassailable." Paulino offers no argument that the police officers' search of him was not justified. As this Court noted in *Nieves*:

> The Supreme Court in *Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969), articulated the bases for a search incident to arrest, those being, "to remove any weapons that the [arrestee] might seek to use in order to resist arrest or effect his escape . . . [or] to search for and seize any evidence on the arrestee's person in order to

prevent its concealment or destruction." *Id.* at 763, 89 S.Ct. at 2040, 23 L.Ed.2d at 694; *see also United States v. Edwards,* 415 U.S. 800, 802–03, 94 S.Ct. at 1234, 1237, 39 L.Ed.2d 771, 775 (1974); *United States v. Robinson,* 414 U.S. 218, 226, 94 S.Ct. 467, 472, 38 L.Ed.2d 427, 435 (1973); *Carter,* 367 Md. at 460, 788 A.2d at 653.

383 Md. at 584, 861 A.2d at 68–69. Because a police officer can lawfully make a "full custodial search in order to support his general need to disarm a suspect or preserve evidence that may be in the individual's possession," we conclude that the police officers were justified in initiating the search of Paulino. *See Robinson, supra.* We do not agree, as the State's argument suggests, that because the police had probable cause to arrest Paulino, the police were justified in searching him to the extent he was searched under the circumstances. The crux of this case, as illuminated *infra,* is not whether the police had the right to search Paulino, but instead whether an exigency existed such that an invasive search, conducted at the scene of the arrest, was reasonable.

Lastly, we examine the final two factors in the *Bell* analysis. We take into consideration the place and manner in which the search of Paulino was conducted. As to the place of the search, Paulino contends that the parking lot of a car wash is a "very public location [that was] within plain view of people who were not involved in the search itself." Further, Paulino contends that the presence of other people, who were not involved in the search of his person made this search exceptionally public and therefore unreasonable. The State contends that the search of Paulino was conducted in an appropriate manner because, in its view, "none of Paulino's clothes were removed, nor is there evidence that any part of his naked body was exposed unduly to any persons other than the searching officers. Paulino's pants were kept in place during the search ... [and] [t]here is absolutely no evidence of any gratuitous or unnecessary action taken by the police." The State also argues that "the search occurred at night in the barricaded stall of ... a 'secluded' car wash" and that no "part of Paulino's naked body was observed or was capable of being

observed by anyone other than the searching officers, much less others at the scene or the general public."

The decisions of other jurisdictions are instructive. In *McGee,* police officers, acting on information from an informant approached McGee, suspecting that he was selling crack cocaine. As the police officers approached McGee they observed "marijuana smoke in the air above McGee and a marijuana cigarette on the ground next to him." *McGee,* 105 S.W.3d at 614. The police arrested McGee, and drove him to a nearby fire station. In a secluded area of the station, McGee was ordered to "drop his pants, bend over, and spread his buttocks." *McGee,* 105 S.W.3d at 613. The officer then performed a "visual search of McGee's anal region." *Id.* The court concluded that the search of McGee amounted to a visual body inspection. To assess the reasonableness of the search of McGee, the court applied the four factors of the *Bell* analysis. In analyzing the place where the search was conducted, the court noted that "the search must be conducted in a hygienic environment where there is no risk of infection." *McGee,* 105 S.W.3d at 617. Further, the court held that the searching officer acted appropriately to protect the privacy interest of McGee because he took him to a separate location within the firehouse that was more secluded. *Id.* (citing *Logan v. Shealy,* 660 F.2d 1007, 1014 (4th Cir.1981) (noting that strip searches and body cavity searches involve such an intrusion that they should rarely be conducted in public places)).

The testimony from the suppression hearing in the case *sub judice,* viewed in the light most favorable to the State, does not indicate that the officers made any attempt to protect Paulino's privacy interests. The search was conducted in the very place in which he was arrested, a car wash. Similarly, there is no indication in the record before us that the police made any attempt to limit the public's access to the car wash or took any similar precaution that would limit the ability of the public or any casual observer from viewing the search of Paulino. In our view, the search as conducted was unreasonable.

The United States Court of Appeals, Eighth Circuit, recently decided *United States v. Williams*, 477 F.3d 974 (8th Cir.2007). In *Williams*, the police obtained a warrant to search Robert Lee Williams's home and his person. Prior to executing the warrant, the police conducted a traffic stop of Williams's vehicle. "A pat-down search revealed something inside Williams's pants, but the officers testified they decided not to search Williams more extensively while on the street because they were concerned about his privacy. Instead, they took Williams into custody, placed him in a squad car, and drove him several blocks to the police department's Fourth Precinct building." *Williams*, 477 F.3d at 975. The police then conducted a search of Williams in the parking lot of the police precinct, opening Williams's pants, reaching inside his underwear and retrieving contraband near his genitals. The court held that, in that instance, the search was not unreasonable. The court noted, however, that "there is no evidence that [a citizen] would have seen the private areas of Williams's body or any contact between the gloved hand of the officer and Williams's genitals, which remained obscured from the view of passers-by." *Williams*, 477 F.3d at 977.

We contrast the facts of *Williams* to the facts of the present case. The search of Williams was a "reach-in" [6] type of search. Williams's pants were opened, but presumably kept on his waist, while the officer reached into his underwear and retrieved the contraband. In contradistinction, during the search of Paulino, his pants were below his waist, his underwear was "lifted up" and the cheeks of his buttocks were manipulated and exposed. In our view, the search of Paulino was far more invasive and, as a result, required a higher degree of privacy than the search conducted in *Williams*. Moreover, there is no evidence that the search of Paulino was

---

**6.** A "reach-in" search involves a manipulation of the arrestee's clothes such that the police are able to reach in and retrieve the contraband without exposing the arrestee's private areas. *See, U.S. v. Williams*, 477 F.3d 974 (8th Cir.2007); *State v. Jenkins*, 82 Conn.App. 111, 842 A.2d 1148 (2004); *McCloud v. Commonwealth*, 35 Va.App. 276, 544 S.E.2d 866 (2001).

shielded from the view of passers-by or the people present at the scene.

In the instant case, the State contends that because the search did not occur on the side of a well-traveled highway and was conducted at night; the search, therefore, was reasonable. The State appears to overlook that its failure to prove exigent circumstances and the reasonableness of the search are determinative. As we have noted previously, "the burden is on those seeking the exemption [from the warrant requirement] to show the need [for the search]." *See Coolidge,* 403 U.S. at 455, 91 S.Ct. at 2032, 29 L.Ed.2d at 576. There was no testimony at the suppression hearing in the case *sub judice,* that Paulino was attempting to destroy evidence, nor that he possessed a weapon such that an exigency was created that would have required the police officers to search Paulino at that precise moment and under the circumstances, in a "well-lit" public car wash. There is no dispute that members of the public were present, specifically, the other passengers in the Jeep Cherokee. It is their presence, whether their view was obscured or otherwise, that makes the search of Paulino unnecessarily within the public view and thus violative of the Fourth Amendment.[7] The police could have taken any number of steps, including patting Paulino down for weapons at the scene of the arrest and conducting the search inside the Jeep Cherokee vehicle in which Paulino was a passenger, or at the police station, to protect Paulino's privacy interest. Similarly, the police could have conducted

---

7. In support of its contention that the police took "reasonable precautions to protect Paulino's privacy interest," the dissent assumes facts that were not adduced at the suppression hearing. Specifically, the dissent incorrectly assumes that "no one saw Paulino's genitalia, and no one other than the searching officer saw Paulino's buttocks." Detective Latchaw's testimony at the suppression hearing simply does not support this contention. To the contrary, it is entirely conceivable that the search of Paulino was visible to any of the persons present at the scene of the arrest. There is no dispute that three of Paulino's associates were present as well as a team of Baltimore County police officers. Moreover, Detective Latchaw did not testify that the searching officer took any precautions to shield Paulino's body, particularly the obviously exposed part of his buttocks, from public view.

the search in the privacy of a police van. *See Dorlouis,* 107 F.3d at 256. During the transportation of Paulino from the scene of the arrest to the station or to a more private location, the police had the ability to secure Paulino to prevent his destruction or disposal of the contraband found on his person. Instead, they chose to search him in a public place in the view of others. Accordingly, we hold that the search of Paulino unreasonably infringed on his personal privacy interests when balanced against the legitimate needs of the police to seize the contraband that Paulino carried on his person.

**JUDGMENT OF THE COURT OF SPECIAL APPEALS REVERSED. BALTIMORE COUNTY TO PAY THE COSTS IN THIS COURT AND IN THE COURT OF SPE-CIAL APPEALS.**

CATHELL, BATTAGLIA and WILNER, JJ., dissent.

Dissenting Opinion by BATTAGLIA, J., which CATHELL and WILNER, JJ., join.

I respectfully dissent.

The crux of the present case is whether the police's search of Paulino was reasonable under the Fourth Amendment.[1] The majority concludes that the search was both a highly intrusive strip search and a visual body cavity search and holds that the search was unreasonable, emphasizing the location of the search and the perception that there was a lack of exigency. I disagree that the search constituted a strip search or a visual body cavity search, and that the search was unreasonable.

### A.

In *State v. Nieves,* 383 Md. 573, 861 A.2d 62 (2004), we addressed whether a strip search conducted incident to a

---

1. The Fourth Amendment of the United States Constitution provides in relevant part that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV.

lawful arrest for a minor traffic offense was reasonable under the Fourth Amendment. In that case, Nieves' clothes were removed and he was searched at a police station, resulting in the discovery of two small plastic baggies containing cocaine protruding from his rectum; we addressed what constitutes a strip search:

> The term "strip search" has been defined and used in differing contexts in Fourth Amendment jurisprudence. In general, strip searches involve the removal of the arrestee's clothing for inspection of the under clothes and/or body. Some have defined strip searches to also include a visual inspection of the genital and anal regions of the body. Black's Law Dictionary defines a strip search as "a search of a person conducted after that person's clothes have been removed, the purpose usually being to find any contraband the person might be hiding." ... There is a distinction between a strip search and other types of searches, such as body cavity searches, which could involve visually inspecting the body cavities or physically probing the body cavities.

*Id.* at 586, 861 A.2d at 70 (citations omitted). Therefore, a strip search generally involves the removal of clothing and inspection of the naked body; a visual body cavity search entails a specific visual inspection of the anal or genital body cavity areas. In the present case, the

search of Paulino was not a strip search, nor a body cavity search. The evidence adduced at the suppression hearing reflected that police knew that Paulino would be traveling in a Jeep Cherokee near a car wash in the 1100 block of North Point Road in Dundalk around 11 p.m. on September 29, 2000, and that he would be in possession of a quantity of crack cocaine, secreted in his buttocks area between his butt cheeks. Based upon this information, the police arrested Paulino when he arrived at the car wash, placed him on the ground, and conducted the search, lifting up his boxer shorts, reaching between his butt cheeks and securing the baggie. Paulino w as already wearing his pants below his buttocks so that the officers found the drugs by simply "lifting up [Paulino's] shorts," but *not* by removing them:

[COUNSEL FOR PAULINO]: And you did conduct a search then, is that correct? How did you come to find the drugs? [DETECTIVE LATCHAW]: Well, when we—when Mr. Paulino was removed from the vehicle and laid on the ground, his pants were already pretty much down around his—below his butt, because I guess that's the fad, these guys like wearing their pants down real low, so it was just a matter of lifting up his shorts, and between his butt cheeks, the drugs were—I believe one of the detectives actually put on a pair of gloves and just spread his cheeks apart a little bit and it was right there.

The fact that Paulino's shorts were pulled away from his waist so that the searching officer could determine whether he had drugs secreted in his buttocks area does not render the intrusion a strip search or a visual body cavity search.

Rather, the search of Paulino was a "reach-in" search incident to a lawful arrest. In *United States v. Williams*, 477 F.3d 974 (8th Cir.2007), after Williams was arrested, an officer opened his pants, reached inside his underwear, and recovered a large amount of drugs. The United States Court of Appeals for the Eighth Circuit distinguished strip searches from "reach-in" searches, noting that unlike a strip search, a "reach-in" search does not involve the exposure of the suspect's private areas:

To be sure, our cases suggest that police officers should "take precautions to insure that a detainee's privacy is protected from exposure to others unconnected to the search," *Jones v. Edwards*, 770 F.2d 739, 742 (8th Cir.1985), but *Jones*, like *Starks v. City of Minneapolis*, 6 F.Supp.2d 1084 (D.Minn.1998), analyzed whether police may conduct a strip search during which a suspect must expose fully his or her private areas. *Jones*, 770 F.2d at 740; *Starks*, 6 F.Supp.2d. at 1088–1089. *In contrast, a reach-in search of a clothed suspect does not display a suspect's genitals to onlookers, and it may be permissible if police take steps commensurate with the circumstances to diminish the potential invasion of the suspect's privacy.*

*Id.* at 977 (emphasis added) (citations omitted). *See also United States v. Ashley,* 37 F.3d 678, 682 (D.C.Cir.1994) (officer opened individual's pants and discovered a bag from drugs inside his underwear); *United States v. Williams,* 209 F.3d 940 (7th Cir.2000) (police officer conducted search wherein he reached into the back of Williams's undershorts and removed a plastic bag containing cocaine from between Williams's buttocks); *State v. Smith,* 342 N.C. 407, 464 S.E.2d 45, 46 (1995) (officer searched individual by pulling open pants and underwear and reaching in to retrieve drugs). Therefore, a "reach-in" search, or a search of a clothed suspect wherein the officer conducting the search reaches between an individual's clothing and his skin, without exposing the individual's genitalia to onlookers, is not the same as a strip search or visual body cavity search and its reasonableness is measured by its limited intrusiveness weighed against the needs of the police to seize drugs they believe are secreted on a suspect's body. *See Bell v. Wolfish,* 441 U.S. 520, 559, 99 S.Ct. 1861, 1884, 60 L.Ed.2d 447, 481 (1979) ("The test for reasonableness under the Fourth Amendment is not capable of precise definition or mechanical application. In each case it requires a balancing of the need for the particular search against the invasion of personal rights that the search entails. Courts must consider the scope of the particular intrusion, the manner in which it is conducted, the justification for initiating it, and the place in which it is conducted."); *Nieves,* 383 Md. at 583, 861 A.2d at 68 ("In determining the reasonableness of a search, each case requires a balancing of the government's need to conduct the search against the invasion of the individual's privacy rights.").

In *Williams,* 209 F.3d at 940, the police conducted a traffic stop of Williams's vehicle, after which they asked Williams to get out of his car and for consent to search his person. After Williams was arrested, he attempted to flee the scene; the police apprehended him, and an officer reached into the back of Williams's pants, within his undershorts, and removed a plastic bag containing cocaine from between his buttocks. Addressing whether the search was unreasonable, the United

States Court of Appeals for the Seventh Circuit concluded that it was reasonable because the search was not significantly more intrusive than necessary:

> Williams next argues that the "crack" seized from him should be suppressed because it was found when Officer Lewis "strip searched" him at the scene subjecting him to great humility and indignity. The district court, however, construed the search as a search incident to an arrest, not a strip search.
>
> *     *     *
>
> *Lewis retrieved the object by sliding his hand under Williams' waistband and down the back part of his pants. Williams was never disrobed or exposed to the public. The search occurred at night, away from traffic and neither officer saw anyone in the vicinity. Additionally, Williams' attempt to flee the scene and his physical resistance prior to the retrieval of the substance suggest that he would have tried to further conceal or dispose of the evidence had they not retrieved it immediately. In this case, the scope of the initial pat-down search by the officers was no more intrusive that which was already permitted. . . . The officers' seizure of the drugs did not add significantly to Williams' invasion of privacy.* Based on the officers' experience, the scope of the search, its justification and the place where it occurred, the district court did not clearly err in concluding the search of Williams was not overly intrusive and was correct in denying the motion to suppress.

*Id.* at 943–44 (emphasis added).

In *Williams,* 477 F.3d at 974, the United States Court of Appeals for the Eighth Circuit addressed a search wherein, on a police precinct parking lot surrounded by a residential neighborhood, an officer opened Williams's pants, reached inside his underwear, and removed a large amount of crack and powder cocaine. Assessing the reasonableness of the "reach-in" search, the court noted that "[t]here is no question that police were justified in searching inside Williams's pants [because] [t]he police possessed a warrant authorizing them to

search his person for drugs and firearms, and an initial pat-down produced specific probable cause that Williams was hiding something inside his pants," and that the proper issue was "whether the search was reasonable in its scope, manner, and location." *Id.* at 975. In this respect, the court concluded that the search was reasonable, remarking that the officers took sufficient precautions to protect Williams's privacy:

> We believe that the officers took sufficient precautions to protect Williams's privacy before fulfilling their legitimate need to seize contraband that Williams had chosen to carry in his underwear. The police refrained from searching Williams on a public street, and instead took him to the more private precinct parking lot. The parking lot is partially secluded. It holds squad cars and the cars of police employees, and is surrounded by a chain link fence that is topped by barbed wire and covered to some degree with vegetation. The district court's findings of fact recounted uncontradicted testimony of police officer Randy Olson that no vehicles entered the lot during the search, and that he saw no person other than police officers-either inside or outside the parking lot-within eyesight of the brief search. To the extent any citizen observed the search without notice of the police, there is no evidence that such a person would have seen the private areas of Williams's body or any contact between the gloved hand of the officer and Williams's genitals, which remained obscured from the view of passers-by. Rather, the citizen would have observed from a distance that an officer briefly reached inside Williams's pants and pulled out a bag of cocaine. We conclude that such a search does not unreasonably infringe on Williams's privacy interests when balanced against the legitimate needs of the police to seize contraband that he carried on his person.

*Id.* at 977–78.

Likewise, in *Smith*, 464 S.E.2d at 45, the defendant was stopped by police officers, and informed that he was suspected of transporting cocaine; the officer stood between the open car door and Smith and pulled back and down Smith's pants

and underwear, reached in, and pulled out a paper towel containing cocaine from under Smith's scrotum. Assessing the reasonableness of the search, the Supreme Court of North Carolina reversed the intermediate appellate court and adopted the dissent, *State v. Smith,* 118 N.C.App. 106, 454 S.E.2d 680, 687 (1995) (Walker, J., dissenting), wherein Judge Walker concluded that the search was reasonable because there were sufficient exigent circumstances to conduct the search in the street to prevent the loss or destruction of the drugs and because the officer took precautions to protect Smith's privacy interests:

> The search in the instant case took place at approximately 1:30 A.M. at the intersection of two streets in Fayetteville. The record does not reveal the conditions at the time, and defendant's objection was that he did not want the officer to "search [his] rear" in "the middle of the street."
>
> Here the evidence does show that prior to the search Officer Cook asked defendant to step behind the open car door of his vehicle and that he positioned himself between defendant and the car door on the outside. Officer Cook said he took these steps "because [he] didn't want to expose [defendant] to other cars, the public, to embarrass him, that sort of thing." Defendant did not dispute this testimony. Considering the totality of the circumstances, I believe that the officers here, like the trooper in *Bazy,* took "the necessary and reasonable precautions to prevent the public exposure of defendant['s] . . . private areas." While there may have been other less intrusive means of conducting the search, I agree with the *Bazy* court that the availability of those less intrusive means does not automatically transform an otherwise reasonable search into a Fourth Amendment violation. Just as the court in *Bazy* was unwilling to second guess the procedures used by the officers in that case, I am unwilling to second-guess the trial court's finding here that the officers' conduct during the search did not violate defendant's Fourth Amendment rights. The trial court in ruling on defendant's motion to suppress had the arguments of both parties before it and was in a superior position to evaluate

> the reasonableness of the search. I do not believe defendant is entitled to a new trial, and I would affirm the trial court in all respects.

*Id.* at 687 (Walker, J., dissenting). Similar to the searches conducted in those cases, the search of Paulino was reasonable under the *Bell* reasonableness balancing test; the police needed to conduct the search in order to prevent either loss or destruction of the drugs, which could have occurred while in transit, and the officers protected Paulino's privacy interests by conducting the search in such a manner to prevent any onlookers from viewing his genitalia.

The majority contends, because the officer touched Paulino's clothes and body to view and secure the drugs, that the search constituted a strip search, citing *Amaechi v. West,* 237 F.3d 356 (4th Cir.2001) (officer walked Amaechi to police car, causing her house dress to fall open, and during search, swiped his hand across Amaechi's vagina causing slight penetration of her genitals); *United States v. Dorlouis,* 107 F.3d 248 (4th Cir.), *cert. denied,* 521 U.S. 1126, 117 S.Ct. 2525, 138 L.Ed.2d 1025 (1997) (police took Paul inside a police van and ordered him to remove his clothes); *United States v. Vance,* 62 F.3d 1152 (9th Cir.1995) (Vance consented to a pat-down search, which revealed a bulge in his crotch area and that he was wearing two sets of underwear; a customs officer then ordered Vance to remove his trousers and pull down his underwear); *Blackburn v. Snow,* 771 F.2d 556 (1 st Cir.1985) (Blackburn was required by prison officials to remove her clothes so that a matron could view her armpits, lift her breasts, examine her genitalia, and spread her buttocks apart); *McGee v. State,* 105 S.W.3d 609 (Tex.Crim.App.), *cert. denied,* 540 U.S. 1004, 124 S.Ct. 536, 157 L.Ed.2d 410 (2003) (McGee was forced to remove his pants, bend down, and spread his buttocks); and *Hughes v. Commonwealth,* 31 Va.App. 447, 524 S.E.2d 155 (2000) (Hughes' clothes were removed and he was asked to bend over and cough). These case are not instructive, however, because the searches in those cases involved removal of clothing, which was not present in this case, and because they involved an intentional touching of genitalia,

which was far more intrusive than the touching the officer did in this case to secure the drugs.

Rather, the fact that Paulino was not fully or partially disrobed differentiates the instant search. In *McCloud v. Commonwealth*, 35 Va.App. 276, 544 S.E.2d 866 (2001), the defendant was arrested for possessing a stolen car; during the search incident to the arrest, the officer pulled McCloud's pants and underwear away from his body and discovered plastic baggies containing cocaine. The officer reached inside McCloud's underwear and seized the baggies. In assessing the reasonableness of the search, the intermediate appellate court concluded that the search was not a strip search because the search did not involve full or partial disrobement, nor did it involve the exposure of McCloud's genitalia:

> We have found no cases, nor has appellant cited any, that include "arranging" of the suspect's clothing in a definition of "strip search."

*    *    *

> Further, in a review of a number of federal appellate decisions, we found no cases that characterize a strip search as other than partial or total disrobement. *See Amaechi v. West*, 237 F.3d 356 (4th Cir.2001); *Swain v. Spinney*, 117 F.3d 1 (1st Cir.1997); *Justice v. City of Peachtree City*, 961 F.2d 188 (11th Cir.1992); *Masters v. Crouch*, 872 F.2d 1248 (6th Cir.1989); *Weber v. Dell*, 804 F.2d 796 (2nd Cir.1986); *Salinas v. Breier*, 695 F.2d 1073 (7th Cir.1982).

> In this case, in accepting the Commonwealth's evidence, we find appellant was not subjected to a strip search. Unlike in *Hughes, Moss, Taylor*, and *Gilmore*, appellant's clothing was not removed, and his genital area was not exposed. The officers made no visual inspection of appellant's genitals nor did the officers touch appellant's genitals. Therefore, we affirm the judgment of the trial court.

*Id.* at 868–69.

Further, in *Williams*, 477 F.3d at 974, a case remarkably close to the situation we consider here, the court rejected the argument that a search was unreasonably intrusive because it

involved physical contact, remarking that such contact is un-avoidable when conducting a search for drugs:

> Williams makes two objections to the search. First, he claims it was unreasonably intrusive in its scope and manner because it involved physical contact with his genitals. We disagree. The police could not have removed the drugs that Williams stashed near his genitals without making some "intimate contact," and we reject Williams's claim that such contact is *per se* unreasonable. Some physical contact is permissible, and indeed unavoidable, when police reach into a suspect's pants to remove drugs the suspect has chosen to hide there. . . .
>
> The search of Williams was both less intrusive, as it involved no penetration or public exposure of genitals, and far more justified, as police had probable cause to believe he was carrying drugs inside his pants. We disagree with Williams's claim that the police were required to avoid physical contact with him by directing him to disrobe and then visually inspecting his body for drugs. "A creative judge, engaged in *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished." But the existence of "less intrusive means" does not, by itself, make a search unreasonable. While the potential for destruction of evidence is diminished when a suspect is in custody, it is not completely eliminated, and it was not unreasonable for the officers to assume the initiative by seizing the contraband that Williams secreted in his under-wear, rather than allow Williams to disrobe and remove the drugs himself.

*      *      *

In contrast, a reach-in search of a clothed suspect does not display a suspect's genitals to onlookers, and it may be permissible if police take steps commensurate with the circumstances to diminish the potential invasion of the suspect's privacy.

*Id.* at 976–78 (some citations omitted). Thus, the fact that the search of Paulino involved an officer touching Paulino's buttocks to view the drugs did not automatically make the search an unreasonably intrusive strip search. Instead, Paulino's search was a reasonable "reach-in" search incident to arrest.

## B.

Even were the search of Paulino to be considered a strip search, it was reasonable. Although the majority agrees that strip searches may be reasonable, it finds that the search of Paulino was unreasonable because it was conducted at a "public" car wash in the presence of Paulino's friends who arrived with him in the Jeep Cherokee. In its conclusion, the majority is establishing a *per se* rule that strip searches must be done in an enclosed area. Such a *per se* rule violates the standard of reasonableness iterated in *Bell v. Wolfish*, 441 U.S. at 520, 99 S.Ct. at 1861, 60 L.Ed.2d at 447. In *Bell*, the Supreme Court remarked that whether a strip search is reasonable is incapable of being measured by *per se* rules because the test for reasonableness "is not capable of precise definition or mechanical application." *Id.* at 559, 99 S.Ct. at 1884, 60 L.Ed.2d at 481. The Court did not differentiate between searches conducted in public and searches conducted in enclosed areas, stating that the reasonableness of a search is measured by balancing the need for the particular search—in this case, the police's need to prevent evidence from becoming destroyed or lost—against the invasion of privacy the search entails. *Id.*

In *Nieves*, 383 Md. at 573, 861 A.2d at 62, this Court considered whether a strip search was reasonable after Nieves had been stopped for a traffic offense. In assessing the reasonableness of the strip search, we noted that if an individual is connected with drug trafficking, a reasonable strip search incident to a lawful arrest may be conducted. *Id.* at 598, 861 A.2d at 77. Moreover, we did not distinguish searches conducted in public from searches conducted in enclosed areas, instead emphasizing that "[i]n determining the reasonableness of a search, each case requires a balancing of

the government's need to conduct the search against the invasion of the individual's privacy rights." *Id.* at 583, 861 A.2d at 68.

Therefore, whether a search is conducted in public as opposed to in an enclosed area is not controlling; the reasonableness of a search is measured by balancing the need for the search against the intrusion upon the individual's privacy rights. In *State v. Jenkins,* 82 Conn.App. 111, 842 A.2d 1148 (2004), an undercover police officer, after having been informed that the defendant was dealing drugs, arranged to buy heroin from him. When Jenkins approached the officer to sell him the drugs, he was arrested and taken to the side of a restaurant building to be searched; the officer subsequently pulled Jenkins's pants and underwear away from his body and discovered glassine packets of heroin and crack cocaine. Although the court considered the search of Jenkins a strip search, it found the search reasonable under the Fourth Amendment because the officers had reasonable suspicion that Jenkins had drugs on his person, and they adequately protected his privacy interests even though the search was conducted in public:

> A custodial arrest gives rise to the authority to search, even if the arresting officer does not "indicate any subjective fear of the [defendant] or ... suspect that [the defendant] was armed." *"The justification or reason for the authority to search incident to a lawful arrest rests quite as much on the need to disarm the suspect in order to take him into custody as it does on the need to preserve evidence on his person* for later use at trial.... It is the fact of the lawful arrest which establishes the authority to search, and ... in the case of a lawful custodial arrest a full search of the person is not only an exception to the warrant requirement of the Fourth Amendment, but is also a reasonable search under that amendment." (Citations omitted; emphasis added; internal quotation marks omitted). *It was, therefore, of no moment that Brody was searching for weapons or contraband.*

\*    \*    \*

*In this case, the manner in which the officers conducted the strip search struck the appropriate balance between "the need for the particular search" and "the invasion of personal rights. . . ." The officers took the defendant to the side of the restaurant, away from the street and out of public view. [The officer] did not require him to remove any of his clothing, but rather pulled his pants and underwear away from his body specifically to retrieve the glassine packets he discovered and suspected were there from the patdown of the defendant.*

*Id.* at 1157–58 (emphasis added).

Similar to the search conducted in *Jenkins,* the police took reasonable precautions to protect Paulino's privacy interests, and the search, although not done in a physically enclosed space, was no more intrusive than necessary to determine whether Paulino possessed drugs. The evidence at the suppression hearing reflected that Paulino arrived at the car wash late at night when the car wash was closed to the public. The police arrested him, placed him on the ground and conducted the search, lifting up his boxer shorts, reaching between his butt cheeks and securing the baggie, precisely where they were told it would be. The police secured the drugs in Paulino's possession inside the bay of a car wash facility in the rear of a parking lot, blocked in by police vehicles, and secluded behind a storage facility and an automobile repair shop, such that the area could not be seen by passers-by. Although the majority assumes that Paulino's friends were present at the car wash and that they had the ability to view Paulino's buttocks during the search, there was no evidence adduced at the suppression hearing to support this assertion. Although one of the detectives testified that the car wash area was well-lit, there is no evidence that anyone saw Paulino's genitalia, nor that anyone other than the searching officer saw Paulino's buttocks.

Moreover, even when there exists alternatives, or less intrusive means, to conduct a search, that does not by itself render the search unreasonable. *See Byndloss v. State,* 391 Md. 462, 484, 893 A.2d 1119, 1133 (2006) ("A creative judge engaged in

a *post hoc* evaluation of police conduct can almost always imagine some alternative means by which the objectives of the police might have been accomplished. But '[t] he fact that the protection of the public might, in the abstract, have been accomplished by "less intrusive" means does not, itself, render the search unreasonable.' The question is not simply whether some other alternative was available, but whether the police acted unreasonably in failing to recognize or to pursue it."), quoting *Wilkes v. State,* 364 Md. 554, 577, 774 A.2d 420, 433 (2001), quoting in turn *United States v. Sharpe,* 470 U.S. 675, 687, 105 S.Ct. 1568, 1576, 84 L.Ed.2d 605, 616 (1985) (citations omitted).

By holding as it does, the majority impermissibly restricts the police's ability to conduct reasonable searches under the Fourth Amendment for drugs that are secreted on an individual known to be carrying such drugs to prevent their loss. I disagree, and would affirm the judgment of the Court of Special Appeals.

Judges CATHELL and WILNER authorize me to state that they join in this dissent.

Dissenting Opinion by CATHELL, J.

I join Judge Battaglia's dissent and would further hold that when a person wears their pants below the level of their buttocks, he or she is intentionally offering that area for observation by the public and obviously has no expectation of privacy sufficient to prohibit a police officer from also looking.

If a person wants to have an expectation of privacy in that area of his or her body, he or she should keep their pants up when in public.