COURT OF APPEALS OF VIRGINIA


Present:  Chief Judge Fitzpatrick, Judges Benton, Coleman, Elder,
         Bray, Annunziata, Bumgardner, Lemons and Frank
Argued at Richmond, Virginia


BRYON K. HUGHES, S/K/A
 BRYAN K. HUGHES
                                          OPINION BY
v.   Record No. 0702-98-2        JUDGE SAM W. COLEMAN III
                                       FEBRUARY 1, 2000
COMMONWEALTH OF VIRGINIA


                   UPON A REHEARING EN BANC

         FROM THE CIRCUIT COURT OF THE CITY OF RICHMOND
                   Thomas N. Nance, Judge

         Patricia P. Nagel, Assistant Public Defender
         (David J. Johnson, Public Defender, on
         brief), for appellant.

         Marla Graff Decker, Assistant Attorney
         General (Mark L. Earley, Attorney General, on
         brief), for appellee.


     Bryan K. Hughes was convicted in a bench trial of possession

of cocaine with intent to distribute in violation of Code

§ 18.2-248.  He contends the trial court erred by denying his

motion to suppress evidence obtained during a warrantless body

cavity search.

     In an unpublished opinion, a divided panel of this Court

affirmed the trial court's ruling.  We granted rehearing en banc.

Upon rehearing, we hold that the trial court erred by denying

Hughes' motion to suppress the evidence.  Accordingly, we reverse

the trial court's ruling, vacate the panel decision, and dismiss the indictment.

BACKGROUND

On July 10, 1997, Detective J. Renee Payne of the Richmond Police Department received the following message on her "voice mail" from a known and reliable informant:

> there was a very light complected male standing out in the front walk in the area of 320 West Grace Street, and that that person was dealing narcotics there, that he was keeping the money in his left pocket, and that drugs were kept in his underwear area, and that he was wearing a white shirt, blue jeans and he had very pretty hair.

Acting on this information within ten minutes of its receipt, Payne, accompanied by two other uniformed officers, arrived at the intersection of Grace and Madison and observed Hughes standing in the area indicated by the informant. The officers determined that Hughes, "a very light complected male with dark wavy hair wearing blue jeans and a white shirt," was the individual described in the tip.

Payne approached Hughes and advised him "that [she] had received information that a person fitting his description was out there dealing narcotics." Hughes denied possessing any drugs or weapons and consented to a pat-down search, which revealed money in Hughes' left pocket. When Payne discovered the money, she declared, "Well if the money is in your left pocket, then, the drugs should be in your underwear." Hughes agreed to allow Payne

to "check further."  To "ensure [Hughes'] privacy," Officer Rogers escorted Hughes into the front hallway of a nearby apartment building.  Rogers "check[ed]" Hughes' underwear, but he found nothing.  Rogers then said, "Well, if it's not in the front of your underwear, it's got to be behind you," adding "You don't mind going ahead and bending over then, right?"  Without responding, Hughes bent over.  "At that time, [Rogers] told him to cough and it was at that point when [Hughes] coughed that [he] saw the plastic bag."  When Rogers observed part of a plastic bag protruding "halfway" from Hughes' anus and "shake in the air," using gloves, he removed the bag, which contained cocaine, from Hughes' anal cavity.

## ANALYSIS

Hughes contends the cocaine was seized by the police during an unlawful body cavity search and that the trial court erred by failing to suppress the evidence.  Hughes argues that he did not voluntarily consent to the search and that the body cavity inspection and removal of the plastic bag exceeded the scope of his consent to the pat-down search and his consent to allow the officers to "check further."  Hughes also argues that the officers lacked probable cause to arrest him; therefore, the search could not have been a lawful search incident to arrest.

When we review a trial court's denial of a suppression motion, "[w]e view the evidence in a light most favorable to

- 3 -

. . . the prevailing party below, and we grant all reasonable inferences fairly deducible from that evidence." Commonwealth v. Grimstead, 12 Va. App. 1066, 1067, 407 S.E.2d 47, 48 (1991). In our review, "we are bound by the trial court's findings of historical fact unless 'plainly wrong' or without evidence to support them." McGee v. Commonwealth, 25 Va. App. 193, 198, 487 S.E.2d 259, 261 (1997) (en banc) (citing Ornelas v. United States, 517 U.S. 690, 699 (1996)). However, we consider de novo whether those facts implicate the Fourth Amendment and, if so, whether the officers unlawfully infringed upon an area protected by the Fourth Amendment. See id.

"A warrantless search is per se unreasonable and violative of the Fourth Amendment of the United States Constitution, subject to certain exceptions." Tipton v. Commonwealth, 18 Va. App. 370, 373, 444 S.E.2d 1, 3 (1994) (citation omitted). However, searches made by law enforcement officers pursuant to a valid consent to search do not implicate the Fourth Amendment. See Schneckloth v. Bustamonte, 412 U.S. 218, 222 (1973); Iglesias v. Commonwealth, 7 Va. App. 93, 99, 372 S.E.2d 170, 173 (1988) (en banc). When relying upon consent as the justification for a search, the Commonwealth must prove, based upon the totality of the circumstances, that the consent was freely and voluntarily given. See Bumper v. North Carolina, 391 U.S. 543, 548 (1968); Hairston v. Commonwealth, 216 Va. 387, 388, 219 S.E.2d 668, 669 (1975);

Commonwealth v. Rice, 28 Va. App. 374, 378, 504 S.E.2d 877, 879 (1998).  "A consensual search is reasonable if the search is within the scope of the consent given."  Grinton v. Commonwealth, 14 Va. App. 846, 850-51, 419 S.E.2d 860, 862 (1992).

The United States Supreme Court has not expressly defined the term "search."  A search for Fourth Amendment purposes encompasses a wide range of investigative techniques, including wiretapping, electronic surveillance or eavesdropping, photo-optic surveillance, and encompasses physical entry or visual inspection of personal papers, containers, vehicles, buildings, or the person.  As Professor LaFave points out:

> [u]nder the traditional approach, the term "search" is said to imply
>
> "some exploratory investigation, or an invasion and quest, a looking for or seeking out.  The quest may be secret, intrusive, or accomplished by force, and it has been held that a search implies some sort of force, either actual or constructive, much or little.  A search implies a prying into hidden places for that which is concealed and that the object searched for has been hidden or intentionally put out of the way.  While it has been said that ordinarily searching is a function of sight, it is generally held that the mere looking at that which is open to view is not a 'search.'"

1 Wayne R. Lafave, Search and Seizure § 2.1(a), at 379 (3d ed. 1996) (quoting C.J.S. Searches and Seizures § 1 (1953)).

Under the Fourth Amendment, a search is an invasion into a space or area where a person has a reasonable expectation of privacy

in the "person," or the person's "houses," "papers," or "effects."

A search of the person may range from a <u>Terry</u>-type pat-down to a generalized search of the person to the more intrusive strip search or body cavity search. "A strip search generally refers to an inspection of a naked individual, without any scrutiny of his body cavities. A visual body cavity search extends to a visual inspection of the anal and genital areas." <u>Commonwealth v. Thomas</u>, 708 N.E.2d 669, 672 n.4 (Mass. 1999). "A 'manual body cavity search' includes some degree of touching or probing of body cavities." <u>Cookish v. Powell</u>, 945 F.2d 441, 444-45 n.5 (1st Cir. 1991).

Here, Hughes was subjected to all three -- a strip search, a visual body cavity search, and a manual body cavity search. Having Hughes disrobe and looking into his underwear for drugs was a strip search of his person within the purview of the Fourth Amendment. The search became a visual body cavity search when Officer Rogers had Hughes bend over to expose his anus, enabling Rogers to visually inspect the anus. The visual search became more intrusive when Rogers "told" Hughes to cough in order to expand the officer's view of the anus and an even more intrusive physical body cavity search when Rogers removed the plastic bag from Hughes' anal cavity.

For purposes of determining whether Hughes voluntarily consented to the body cavity searches, we will assume that the officers' initial encounter with Hughes was lawful and that Hughes' consent to a pat-down search or visual inspection inside his underwear was not tainted by or the result of an illegal detention.  See Baldwin v. Commonwealth, 243 Va. 191, 413 S.E.2d 645 (1992) (holding that a confrontation with an officer who commanded a suspect to approach car was a consensual encounter); cf. McGee, 25 Va. App. at 200-01, 487 S.E.2d at 262-63 (holding that a police officer's confrontation with an individual, informing him that he has been identified as a suspect in a particular crime which the officer is investigating, is a seizure and is significant in determining whether the consent to search is voluntary).  After Hughes encountered or was detained by the officers, he unquestionably consented to their searching his person.  However, we hold that having Hughes cough in order to visually inspect the anus and the manual body cavity search of removing the plastic bag from Hughes' anal cavity exceeded the scope of Hughes' consent to search his person.

We held in Moss v. Commonwealth, 30 Va. App. 219, 225, 516 S.E.2d 246, 249 (1999), that a defendant's consent to search his person does not include consent to conduct a strip search.  In Moss, the defendant was approached by a police officer in a gas station parking lot.  The officer identified himself and asked for

permission to search the defendant and the defendant's car for drugs. The defendant consented. While one officer was searching the defendant, another officer observed a marijuana cigarette in the vehicle. The officers also asked for and received consent to search the passenger. Three officers conducted a strip search of the passenger in the restroom of a nearby gas station and discovered crack cocaine secreted in the passenger's buttocks. After recovering the narcotics from the passenger, the officers suspected that the defendant might also be concealing narcotics. They conducted a strip search of the defendant and discovered crack cocaine in the defendant's buttocks. We held that the defendant's consent to search his person did not constitute consent to conduct a strip search or a body cavity search. See id. at 225, 516 S.E.2d at 249.

Here, we find that Hughes consented to a search of his person, but we hold, as a matter of law, that he did not consent to a body cavity search, specifically the visual inspection of the anus after coughing or the manual anal cavity search. In Taylor v. Commonwealth, 28 Va. App. 638, 642, 507 S.E.2d 661, 663 (1998), we held that strip searches, which are "peculiarly intrusive," are constrained by due process requirements of reasonableness and require "special justification." In this case, the officers approached Hughes and asked if he had any drugs or weapons on him. Hughes replied that he did not. Payne then asked Hughes if she

could conduct a pat-down search, and Hughes consented.  When the pat-down resulted in the discovery of money, Payne asserted that the "drugs should be in [Hughes'] underwear."  Hughes then consented to allow the officers to "check further."  Hughes was escorted to an apartment building across the street where he was asked to disrobe, which he did.  Rogers' strip search failed to uncover any contraband.  Rogers then asked Hughes to bend over and "told him" to cough.[1]  At that point, Rogers saw part of a plastic

---

[1] The transcript shows that the search occurred as follows:

CROSS-EXAMINATION

BY MR. FEINMEL [defense counsel]:

Q.  Officer Jones, you did not ask Mr. Hughes for permission to search him; is that correct?

A.  Officer Payne ask [sic] me to search.

Q.  You never did, though, you took him into the house with you?

A.  No, I took him in and started searching him.

Q.  At the time that you took Mr. Hughes to the house and started searching him, was he handcuffed?

A.  I don't know if he was or not.

Q.  Had his wallet been taken from him, do you remember?

A.  I don't recall.

Continued . . .

Continued . . .

Q. Is it safe to say that the money that was found in his pocket had been taken from him by Officer Payne, correct?

A. I'm pretty sure it was, yes.

MR. FEINMEL: No further questions.

REDIRECT EXAMINATION

BY MR. DINKIN [Commonwealth's attorney]:

Q. Do you recall how much money that was? Did you see it beforehand?

A. Not beforehand, it was after the arrest that I saw how much it was.

Q. How much was it?

A. One hundred and ninety-six dollars.

MR. FEINMEL: That's all I have, Judge.

THE COURT: Did Mr. Hughes ever show any reluctance about your search?

OFFICER ROGERS: No, sir. I checked his pockets in the building and, then, when it came time to search his underwear, I said, "Well, do [you] have the drugs in your underwear," and he said, "No." I said, "Well, you don't mind if I check?" He said, "No." I checked, and I didn't find any in the front of his underwear so I said, "Well, if it's not in the front of your underwear then, it's got to be behind you." I said, "You don't mind going ahead and bending over then, right?" He went ahead and bent over. At that time, I told him to cough and it was at the point when he coughed that I saw the plastic bag.

THE COURT: Where was it?

Continued . . .

bag protruding from Hughes' anus, which Rogers then removed.  The bag contained cocaine.

We find, on these facts, that Hughes voluntarily consented to a pat-down search and to a search of his underwear to "check further."  However, we hold that Hughes did not voluntarily consent to cough in order to allow the visual inspection of his anus or voluntarily consent to the manual search of his anal cavity.  We also hold that Officer Rogers could not infer from Hughes' consent to a general pat-down search or consent to search his underwear that he also consented to cough to allow a visual inspection or manual search of a body cavity.  As we noted in Taylor, a strip search is "peculiarly intrusive" and requires "special justification."  A body cavity search is more intrusive than a strip search and, thus, at a minimum also requires "special justification."

The facts show that as the search progressed from one stage to another, Rogers did not ask Hughes to cough, but rather "told" him to do so.  In addition, Rogers did not ask Hughes to consent to Rogers' removing the plastic bag from Hughes' anus.  What began

_____

Continued . . .

> OFFICER ROGERS:  It was shoved up into his rectum, half way up into his rectum so that when he coughed, the plastic that was out of his rectum started to shake in the air.  So it was at that point, I had gloves on so I pulled out the plastic bag.

as a consensual pat-down search methodically moved to the progressively more intrusive strip search, by asking the suspect to bend over in order to visually inspect his anus, then telling him to cough, then physically removing the plastic bag from the anal cavity without any communication.  Even were we to construe Rogers' statements, "Well, if it's not in the front of your underwear then, it's got to be behind you.  You don't mind going ahead and bending over then, right?" as a request for a visual body cavity search and Hughes bending over as consent, after Hughes bent over, Rogers no longer sought Hughes' consent for the continued search.  Rogers told Hughes to cough in order to be able to view farther into the anal cavity.  Without a request for Hughes to consent, we are not able to find that Hughes voluntarily coughed and of his own free will was allowing Rogers to visually inspect his anal cavity.  Because of the highly intrusive and personal nature of body cavity searches, if the police are relying upon consent, it should be abundantly clear that the person agrees to do so of his or her own free will.  In the absence of an express request by a police officer to conduct a visual or manual body cavity search, consent to such a search will not be inferred from a suspect's silence or apparent acquiescence to an officer's progressively extending the scope of a consensual generalized search.  Thus, we hold that Hughes did not consent to the body cavity search from the time he was directed to cough, and he did

not consent to the removal of the plastic bag from his anal cavity.

The Commonwealth next contends that based on the informant's tip, the officers had probable cause to arrest Hughes, and based on the circumstances, had the right to search him, including a body cavity search, incident to the arrest. Assuming for purposes of this opinion that when the officers conducted the body cavity search they had probable cause to arrest Hughes based on the informant's tip and the discovery of the money, we hold that the Commonwealth failed to satisfy the additional requirements necessary to conduct a warrantless body cavity search. We have stated that "a warrantless search involving a bodily intrusion, even though conducted incident to a lawful arrest, violates the Fourth Amendment unless (1) the police have a clear indication that evidence is located within a suspect's body and (2) the police face exigent circumstances." Commonwealth v. Gilmore, 27 Va. App. 320, 330, 498 S.E.2d 464, 469 (1998) (citations omitted).

Here, as we have noted, the evidence gave the officers no "clear indication" that drugs were located in Hughes' anal cavity. Probable cause to believe a suspect possesses drugs, which justifies a search of an individual, does not justify a strip or body cavity search unless the evidence or circumstances specifically provides the officers with a "clear indication" that

the contraband is concealed in a body cavity. See Moss, 30 Va. App. at 225, 516 S.E.2d at 249; see also Schmerber v. California, 384 U.S. 757, 769-70 (1966) (noting that intrusive, warrantless searches may not be conducted on the "mere chance that desired evidence might be obtained"). Here, the officers were relying exclusively on the informant's tip that drugs would be found in Hughes' "underwear area." The officers, upon finding money in Hughes' left pocket, assumed drugs would be found in Hughes' undergarments. But no facts existed that would justify their conclusion that Hughes was hiding drugs in his anal cavity. Thus, no evidence provided the officers with a "clear indication" that Hughes might have the contraband in his anus. Accordingly, we do not decide whether exigent circumstances existed.

In summary, we find that the body cavity search of Hughes violated the Fourth Amendment and that the trial court erred in refusing to suppress the evidence obtained from the search. Without the evidence acquired during the illegal search, no evidence exists to support the conviction; accordingly, we dismiss the indictment. See Barrett v. Commonwealth, 250 Va. 243, 248, 462 S.E.2d 109, 112 (1995).

Reversed and dismissed.