COURT OF APPEALS OF VIRGINIA

Present:   Judges Ortiz, Lorish and Senior Judge Petty
Argued at Lexington, Virginia

SHANTA ORLANDO HUBBARD, A/K/A
  SHAWN HUBBARD
                                                            OPINION BY
v.        Record No. 0795-23-3                     JUDGE LISA M. LORISH
                                                          MARCH 12, 2024
COMMONWEALTH OF VIRGINIA


FROM THE CIRCUIT COURT OF THE CITY OF LYNCHBURG
F. Patrick Yeatts, Judge

W. Cameron Warren (M. Pack Law, PLLC, on brief), for appellant.

J. Brady Hess, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


        During a traffic-related stop, officers searched Shanta Orlando Hubbard on the side of the

road.  An officer patted down Hubbard, examined his pockets, put his hand between Hubbard's

shorts and underwear and "swiped" his buttocks, all while Hubbard stood by the side of the road.

After feeling a hard object in his bottom, the officer struggled to remove the item as Hubbard

resisted by clenching his posterior.  During this engagement, the officer looked and reached inside

Hubbard's underwear.  Hubbard's shorts (though not his underwear) dropped to the ground.

Officers gave up after more than a minute and a half of trying to remove the item and decided to

take Hubbard to the jail for further processing.  After a pause, the search resumed, and an officer

again reached inside Hubbard's underwear, proclaiming that he could feel the item but could not

remove it because Hubbard was clenching his bottom together.  Ultimately, the officer extracted a

plastic bag filled with smaller plastic bags containing crack and powder cocaine.

The standard for assessing the constitutionality of warrantless intrusive bodily searches under the Fourth Amendment is higher than it is for other types of warrantless searches. First, the officer conducting the search must have a clear indication that the concealed object is present. Second, exigent circumstances must justify the search. Finally, the search must be conducted in a reasonable manner, consistent with the Fourth Amendment. Applying the test for intrusive searches here, we agree with the trial court that officers had a clear indication that drugs were likely present in Hubbard's bottom. But we disagree with the trial court that exigent circumstances existed based on the mere speculation that the concealed item could have contained fentanyl. We cannot find support in the record for any other exigent circumstances without the development of other facts—a task we cannot take up on appeal. Finally, while Hubbard waived his right against warrantless searches of his person in a prior plea agreement, we have already held that a general consent to a warrantless search does not include an intrusive search of private areas. Thus, the Fourth Amendment requires reversal.

## BACKGROUND[1]

In June 2020, City of Lynchburg Police Officer Waterman stopped Shanta Hubbard's truck for a suspected traffic infraction. As he approached the truck, Officer Waterman smelled "the odor of marijuana." After identifying Hubbard as the driver, Officer Waterman ran his license through a database to determine whether Hubbard had any active warrants. The officer learned that Hubbard had an active Fourth Amendment rights waiver from a 2012 plea agreement in which Hubbard waived his Fourth Amendment rights and consented to warrantless searches of his person and property for ten years. Based on the smell of marijuana and the rights waiver, Officer Waterman ordered Hubbard and his passenger out of the truck and began to search it.

---

[1] "In accordance with familiar principles of appellate review, the facts will be stated in the light most favorable to the Commonwealth, the prevailing party at trial." *Poole v. Commonwealth*, 73 Va. App. 357, 360 (2021) (quoting *Gerald v. Commonwealth*, 295 Va. 469, 472 (2018)).

Officer Waterman found green plant material on the floorboards as well as bags of white and brown powders that were "knotted up" in a manner consistent with the appearance and packaging of illegal drugs.

Officer Waterman then began to search Hubbard, while another officer searched the passenger. Officer Waterman found about $2,000 in Hubbard's pockets, and then told Hubbard that he would unbutton his shorts to check his "groin area." Officer Waterman put his hand "inside of" Hubbard's shorts to "swipe" his buttocks over the outside of Hubbard's underwear. He "felt a large rock-like object" consistent with a controlled substance. At that point, Hubbard clenched his buttocks together and tried to reach inside his shorts with his hands that were handcuffed behind his back. Another officer came to assist Officer Waterman during the search by holding Hubbard's wrists to prevent him from reaching down.

Officer Waterman then pulled back Hubbard's boxer shorts and looked inside as his body camera confirms. Officer Waterman said he was "trying to see where it went," and the Commonwealth later introduced stills from the body camera footage of the view inside Hubbard's boxer shorts as exhibits at trial. While looking inside, Officer Waterman also reached inside and tried to retrieve the hard object, but struggled with Hubbard, who was clamping his buttocks together tightly. During this struggle, the officers lost their grip on Hubbard's outer shorts, which fell down to his ankles for a few seconds before the officers could pull them back up again. After about two minutes, officers paused the search and decided to "try and get it out at the jail." Testifying at the later motion to suppress hearing, an officer explained this was because "you know, we're sitting here reaching in the back of his shorts [and] [h]e's not letting us get it" and "we understand the dynamics of it and how it looks when we're trying to retrieve this item."

While two of the officers focused on securing the truck's other passenger, a third officer remained next to Hubbard. The officer saw Hubbard shaking his leg and reaching toward the back

of his shorts. While Hubbard's arms remained handcuffed together behind his back, the officer believed Hubbard was trying to remove the item from his shorts. The officer feared that Hubbard would shake out the item and then "kick it, stomp it out" or "destroy it." Officer Waterman testified that his concern was that if the drugs in Hubbard's buttocks were "fentanyl and he had stomped it out and a gust of wind would have came by, it could have killed all of us."

Thus, officers resumed the search, again reaching into Hubbard's boxers. It took about a minute for them to extract the object, as Hubbard was again tightly clenching his buttocks to prevent the removal. Officer Waterman testified that the item was "partially clenched between his buttocks and then it was laid up against his boxer shorts" when they finally removed it. The item was packaged in a plastic bag containing 87 smaller bags of crack and powder cocaine, later confirmed through lab testing.

Before trial, Hubbard moved to suppress all the evidence obtained because of the search. Hubbard conceded that the Fourth Amendment waiver he agreed to in a previous plea agreement was valid but argued that "a warrantless body cavity search is peculiarly intrusive and does not fall within the scope and consent of the waiver."

The trial court found that it was objectively reasonable for the police to believe they had consent to remove the item from Hubbard's buttocks, considering Hubbard's agreement to warrantless searches in his prior plea agreement, but ultimately finding that the officers had a clear indication that Hubbard was concealing drugs and that there were exigent circumstances. Emphasizing the wide-spread presence and dangerousness of fentanyl (and noting that it would be a "closer call" in a pre-fentanyl era), the trial court found that the possibility that the drugs were fentanyl created an exigent circumstance justifying the police reaching into Hubbard's underwear and retrieving the item from his buttocks. This was necessary to ensure the item was transported

- 4 -

"safely and securely" without exposing "other individuals to a harmful substance." Thus, the trial court denied the motion to suppress.

Following the jury's finding of guilt, the trial court convicted Hubbard of possession with intent to distribute. Hubbard appeals.

ANALYSIS

Hubbard challenges the trial court's denial of his pretrial motion to suppress. He argues that Officer Waterman publicly strip searched him without sufficient justification and that this warrantless search violated his Fourth Amendment[2] right against unreasonable searches and seizures. On brief, the Commonwealth argues that the search was constitutional because Hubbard consented to warrantless searches in his prior plea agreement, and, alternatively, because the officers met the criteria to carry out a valid public strip search—the officer had a clear indication that drugs were present, and there were exigent circumstances.

In evaluating a trial court's decision on a motion to suppress, "an appellate court must give deference to the factual findings of the [trial] court and give due weight to the inferences drawn from those factual findings; however, the appellate court must determine independently whether the manner in which the evidence was obtained meets the requirements of the Fourth Amendment." *Moore v. Commonwealth*, 69 Va. App. 30, 36 (2018) (quoting *Commonwealth v. Robertson*, 275 Va. 559, 563 (2008)). Because the officers searched Hubbard without a warrant, "the Commonwealth ha[d] the burden of proving the legitimacy of [the] warrantless search and seizure." *Reittinger v. Commonwealth*, 260 Va. 232, 235-36 (2000) (quoting *Simmons v. Commonwealth*, 238 Va. 200, 204 (1989)). On appeal, Hubbard "bears the burden of

_____

[2] In only relying on the Fourth Amendment of the United States Constitution, Hubbard has not claimed that the Virginia Constitution provides him different or broader rights.

establishing that reversible error occurred." *Williams v. Commonwealth*, 71 Va. App. 462, 474 (2020).

We begin by reviewing our caselaw with respect to Fourth Amendment waivers, and we ultimately agree with the position the Commonwealth conceded was correct at oral argument— that consent to warrantless searches in a plea agreement does not include consent to intrusive searches of private areas. Then we consider whether the warrantless search of Hubbard's person was constitutional in light of the heightened standard that applies to intrusive bodily searches and find that the evidence presented below failed to clear this high hurdle.

A.  Consent to warrantless searches of a person in general, even when provided pursuant to plea agreement, does not include consent to intrusive searches of private areas in or on the body.

The Fourth Amendment provides that

> [t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized.

"[W]arrantless searches are *per se* unreasonable, subject to a few specifically established and well-delineated exceptions." *Megel v. Commonwealth*, 262 Va. 531, 534 (2001). The "number of exceptions to the Fourth Amendment warrant requirement" make the question of whether a search is reasonable or not "exceedingly difficult." *Parady v. Commonwealth*, 78 Va. App. 18, 30 (2023). One such exception is consent. *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (explaining that it is "well settled that one of the specifically established exceptions to the requirements of both a warrant and probable cause is a search that is conducted pursuant to consent").

Our Supreme Court has recognized that a defendant may consent to warrantless searches and seizures as part of a plea agreement, subject to the traditional rules about waivers of rights.

In general, "[t]o justify a search on the basis of a waiver, the Fourth Amendment requires the Commonwealth to show that the waiver was given voluntarily and did not result from coercion." *Anderson v. Commonwealth*, 256 Va. 580, 584 (1998); *cf. Peterson v. Commonwealth*, 5 Va. App. 389, 396 (1987) (A "waiver of any constitutional right must be knowingly, intelligently, and voluntarily made."). Thus, a challenge to an agreed-upon provision in a plea agreement is generally an argument that the defendant did not do so voluntarily, knowingly, or consensually. *Anderson*, 256 Va. at 584.[3]

Here, however, Hubbard does not argue that his waiver of rights in his prior plea agreement was involuntary or unknowing; instead, he challenges the scope and meaning of the waiver. Our Court treats plea agreements as contracts between a defendant and the Commonwealth. *Griffin v. Commonwealth*, 65 Va. App. 714, 718 (2016) (stating that "[o]nce accepted, courts generally treat plea agreements as binding contracts . . . []subject to constitutional considerations"). According to Hubbard, he did not consent to, or waive his right against, intrusive bodily searches under the contract.

Hubbard's October 12, 2012 plea agreement stated:

> As a condition of this plea agreement the defendant specifically
> agrees to waive his Fourth Amendment right against a warrantless
> search for a period of TEN (10) years from the date of sentencing.
> The defendant agrees to consent and voluntarily submit to a
> warrantless search of his person, place of residence or any vehicle
> he is occupying, at any time of the day or night by any law

---

[3] In contrast, Fourth Amendment waivers imposed as court-ordered conditions of probation are analyzed for reasonableness, consistent with this Court's review of all conditions of supervision. *Murry v. Commonwealth*, 288 Va. 117, 122 (2014). "Probation conditions must be reasonable in light of the nature of the offense, the defendant's background, and the surrounding circumstances." *Id.* For this reason, our Supreme Court found unreasonable a condition subjecting a probationer to "searches of his person, property, residence, and vehicle at any time by any probation or law enforcement officer" without a warrant or "even reasonable cause" for "both probation and investigative purposes" because it effectively "extinguishe[d]" the probationer's Fourth Amendment rights, and "[n]othing in the record establishe[d] that a complete waiver" was "necessary to facilitate his rehabilitation and protect the public." *Id.* at 126-28.

enforcement officer during this period. The defendant further agrees that any evidence seized from such search shall be admissible in any hearing or trial resulting therefrom.

We interpret the terms of the plea agreement using contractual principles that are tempered by the "constitutional considerations" surrounding consent in the Fourth Amendment context. *Griffin*, 65 Va. App. at 718.

There is no question that Hubbard generally consented to warrantless searches of his person, place of residence, or any vehicle he is occupying, at any time, by any law enforcement officer. But we have previously held that general "consent to search [one's] person would not, without more, justify a strip search or a body cavity search." *Moss v. Commonwealth*, 30 Va. App. 219, 224 (1999). Instead, "strip searches require special justification since they are peculiarly intrusive." *Taylor v. Commonwealth*, 28 Va. App. 638, 642 (1998). We applied this same basic principle in *Hughes v. Commonwealth*, 31 Va. App. 447, 456 (2000) (en banc), explaining that the defendant "unquestionably consented" to officers "searching his person," but that "having Hughes cough in order to visually inspect the anus and the manual body cavity search of removing the plastic bag from Hughes' anal cavity exceeded the scope of Hughes' consent to search his person." Thus, our Court has understood that a defendant's consent to search her person does not include consent to an intrusive search of the body. And while the consent in *Moss* and *Hughes* was verbal, we see no reason why the same logic would not apply to written consent like we consider here.

In fact, the conclusion that consent to a search of one's person is not consent to a search of the private parts of the body might be even stronger in the contractual context of a plea agreement. Typically, terms in a contract are given their "ordinary significance." *Dowling v. Rowan*, 270 Va. 510, 516 (2005). As we have already noted, our Court interprets general consent to a search of one's person *not* to include consent to intrusive bodily searches. This

- 8 -

tracks a "common sense" understanding of what a search of one's person entails—criminal defendants would probably not have agreed to searches of their person if they understood that such consent would grant access to the most private parts of their body for no reason whatsoever. *Globe Refining Co. v. Landa Cotton Oil Co.*, 190 U.S. 540, 543 (1903) (Holmes, J.) ("[C]ommon rules" incorporated into a contract are determined by "common sense," and are those "the parties probably would have [worked out] if they had spoken about the matter."). A contractual consent to warrantless searches of the person carries with it an inherent presumption that intrusive searches of private areas are not included. *Cf. Mills v. Mills*, 77 Va. App. 543, 566 n.7 (2023) (interpreting a contract awarding "all attorney fees" to "contain an inherent presumption that the fee award will be reasonable, unless the parties clearly and expressly intend otherwise," because a presumption of reasonableness would be the "'ordinary significance' assigned to a provision addressing attorney fees").

Thus, we agree with the legal position the Commonwealth adopted at oral argument—that the mere fact that Hubbard consented to warrantless searches of his person in his plea agreement did not authorize officers to conduct an intrusive bodily search. Our next task is to determine whether the warrantless and intrusive search of Hubbard's person was constitutional.

B. All intrusive bodily searches are subject to a heightened standard under the Fourth Amendment.

The United States Supreme Court in *Schmerber v. California*, 384 U.S. 757, 768, 769-70 (1966),[4] explained that "[t]he interests in human dignity and privacy which the Fourth

---

[4] Explaining why bodily intrusive searches are different, other courts "have recognized that strip and visual body cavity searches impinge seriously upon the values that the Fourth Amendment was meant to protect." *Swain v. Spinney*, 117 F.3d 1, 6 (1st Cir. 1997). Indeed, "[a] strip search is 'viewed as an extraordinary invasion of privacy.'" *Cotto v. City of Middletown*, 158 F. Supp. 3d 67, 78 (D. Conn. 2016) (quoting *Bolden v. Vill. of Monticello*, 344 F. Supp. 2d 407, 417 (S.D.N.Y. 2004)). "Strip searches are different in nature, quality, and intrusiveness from full searches of a person's body." *People v. King*, 292 P.3d 959, 961 (Colo. App. 2011).

Amendment protects forbid any such [bodily] intrusions on the mere chance that desired evidence might be obtained." Instead, a "clear indication that in fact such evidence will be found" is necessary, the "means and procedures" must "respect[] relevant Fourth Amendment standards of reasonableness," and the circumstances must suggest an "emergency." *Id.* at 768, 770-71. Relying on *Schmerber*, we held that "a warrantless search involving a bodily intrusion, even though conducted incident to a lawful arrest, violates the Fourth Amendment unless" three criteria are met: (1) "the police have a 'clear indication' that evidence is located within a suspect's body," (2) "the police face exigent circumstances," and (3) "the means and procedures employed by the authorities to conduct a search involving an intrusion into the body . . . satisfy 'relevant Fourth Amendment standards of reasonableness.'" *Commonwealth v. Gilmore*, 27 Va. App. 320, 330-31 (1998) (quoting *Schmerber*, 384 U.S. at 768).

Since setting out this three-part test, we have issued a string of other opinions dividing the concept of bodily intrusive searches into three subcategories: strip searches, visual body cavity searches, and manual body cavity searches. In *Hughes*, we explained that a "search of the person may range from a *Terry*-type pat-down to a generalized search of the person to the more intrusive strip search or body cavity search." 31 Va. App. at 455. We suggested that a strip search "generally refers to an inspection of a naked individual, without any scrutiny of his body cavities," whereas a "visual body cavity search extends to a visual inspection of the anal and genital areas." *Id.* (quoting *Commonwealth v. Thomas*, 708 N.E.2d 669, 672 n.4 (Mass. 1999)). Finally, "[a] 'manual body cavity search' includes some degree of touching or probing of body cavities." *Id.* (quoting *Cookish v. Powell*, 945 F.2d 441, 444-45 n.5 (1st Cir. 1991)). But while

---

Similarly, "strip searches involving the visual inspection of the anal and genital areas" are recognized as "demeaning, dehumanizing, undignified, humiliating, terrifying, unpleasant, embarrassing, repulsive, signifying degradation and submission," *Mary Beth G. v. Chicago*, 723 F.2d 1263, 1272 (7th Cir. 1983) (quoting *Tinetti v. Wittke*, 479 F. Supp. 486, 491 (E.D. Wis. 1979)), and "more intrusive" than other searches, *id.* at 1274.

*Hughes* adopted these three categories of invasive searches into our caselaw, it did not say if, or how these distinctions mattered in applying the *Gilmore* test.

Indeed, after setting out the categories in *Hughes*, we held only that the defendant "was subjected to all three—a strip search, a visual body cavity search, and a manual body cavity search" and that his consent did not extend to visual or manual searches of his body cavity. 31 Va. App. at 455. Therefore, we looked to whether the Commonwealth established that police had a "clear indication" that evidence was located within the suspect's body, and whether the police faced exigent circumstances. *Id.* Because there was no "clear indication," we never considered the remaining parts of the *Gilmore* analysis.

Subsequent caselaw, and the rationale of *Gilmore*, indicate that *Gilmore*'s three-part test applies equally to all types of body cavity searches.[5] Indeed, "[s]trip searches require special justification since they are peculiarly intrusive"[6] and each category is a "'warrantless search[] involving a bodily intrusion.'" *Moss*, 30 Va. App. at 224 (quoting *Gilmore*, 27 Va. App. at 330). It is also clear that strip searches are the cut off for when the heightened test applies. In other

_____

[5] The only exception is searches of pretrial detainees in the jailhouse setting due to the unique governmental concerns in such an environment. *Winston v. Commonwealth*, 51 Va. App. 74, 81 (2007) (applying the holding from *Bell v. Wolfish*, 441 U.S. 520, 559-60 (1979)).

[6] Other jurisdictions likewise apply similar requirements to roadside strip searches. *See, e.g.*, *Amaechi v. West*, 237 F.3d 356, 364 (4th Cir. 2001) (noting that without "clear justification or exigent circumstances, an officer is not allowed to strip an arrestee on a public street pursuant to a search incident to an arrest"); *State v. Robinson*, 727 S.E.2d 712, 720 (N.C. Ct. App. 2012) ("A valid search incident to arrest . . . will not normally permit a law enforcement officer to conduct a roadside strip search." (alteration in original) (quoting *State v. Fowler*, 725 S.E.2d 624, 628 (N.C. Ct. App. 2012))). Instead, "there must be both probable cause and exigent circumstances that show some significant government or public interest would be endangered were the police to wait until they could conduct the search in a more discreet location." *Id.*; *Cotto*, 158 F. Supp. 3d at 80 ("A strip search in a public place, even if justified by reasonable suspicion, has been uniformly subject to close scrutiny, and has generally required a clear showing of exigent circumstances to justify such an extreme invasion of privacy."); *Commonwealth v. Jeannis*, 122 N.E.3d 496, 502 (Mass. 2019) ("[T]he same constitutional standards apply to both strip searches and visual body cavity searches.").

- 11 -

words, if a search falls short of being a strip search, then the heightened test does not apply at all. *McCloud v. Commonwealth*, 35 Va. App. 276, 283-84 (2001) (concluding that a search was not a strip search because "appellant's clothing was not removed," the "genital area was not exposed" and "officers made no visual inspection of appellant's genitals" or "touched" the same, so no heightened test applied).

When drawing the line between the three subcategories of peculiarly intrusive bodily searches—and explaining why those lines matter—our caselaw has been less clear. For example, in *Kidd v. Commonwealth*, 38 Va. App. 433, 446 (2002), we said that "[l]ooking into . . . underwear for drugs was a strip search." But in *Hughes* we suggested that a strip search only entailed a general "inspection of a naked individual, without any scrutiny of his body cavities," whereas a "visual body cavity search extends to a visual inspection of the anal and genital areas." 31 Va. App. at 455 (quoting *Thomas*, 708 N.E.2d at 672 n.4). Of course, the subcategory of search did not end up mattering in either case because the defendant in *Kidd* specifically consented to the intrusive search, 38 Va. App. at 447, and we concluded that officers had no clear indication drugs were present to justify the intrusive search in *Hughes* (which we determined was made up of all three types of intrusive searches), 31 Va. App. at 455. Nor did the distinction matter in *King v. Commonwealth*, 49 Va. App. 717, 724, 726 (2007), where we classified a defendant being "required to bend over and spread his buttock cheeks" as a "visual body cavity search," because this search also failed under the first prong of *Gilmore* given that there was no "clear indication" that drugs were present.

We clarify here that whether a search is a strip search, a visual cavity search, or a manual cavity search, all such searches are peculiarly intrusive and law enforcement must have a "clear indication" that evidence is concealed, that there are exigent circumstances, and the means and procedures used to obtain the item must be reasonable under the Fourth Amendment. *Gilmore*,

- 12 -

27 Va. App. at 330. The subcategory of intrusive search does not determine whether the *Gilmore* test applies; instead, it impacts the application of the second and third prongs of that test. Manual cavity searches are necessarily more intrusive than visual body cavity searches, which are in turn, more intrusive than strip searches. As the level of intrusiveness increases, the greater the grounds must be to justify that action.[7]

   *1. We must apply* Gilmore *to the search here.*

Turning to this case, both Hubbard and the Commonwealth describe the search that took place as a "strip search."[8] The search began after Officer Waterman smelled marijuana in the truck Hubbard was driving and ran his license only to learn that Hubbard had an operative Fourth Amendment waiver in a prior plea agreement. Officers searched Hubbard's truck and found bags full of powder that appeared to be controlled substances, as well as other physical evidence of marijuana use. After searching Hubbard's truck, Officer Waterman began to search Hubbard's person, including his pockets. Because Hubbard was wearing baggy shorts, Officer Waterman put his hand between Hubbard's shorts and his underwear, and "swiped" Hubbard's

---

[7] Indeed, other courts "considering the strip search issue have also recognized that the more intrusive a search is upon personal rights, the more the government must demonstrate justification for conducting the search." *Justice v. Peachtree City*, 961 F.2d 188, 192 (11th Cir. 1992). *See, e.g.*, *Security and Law Enforcement Employees, District Council 82 v. Carey*, 737 F.2d 187, 207-08 (2d Cir. 1984) (explaining that "the governmental interests vis-à-vis visual body-cavity searches are diminished severely" because "the extent of the[] intrusion is much greater" and "basic concepts of human dignity dictate a course of the utmost caution before an intrusion into the most private parts of the human body is allowed"); *M.M. by C.M. v. Anker*, 607 F.2d 588, 589 (2d Cir. 1979) ("[A]s the intrusiveness of the search intensifies, the standard of Fourth Amendment 'reasonableness' approaches probable cause."); *United States v. Love*, 413 F. Supp. 1122, 1127 (S.D. Tex) ("[T]he greater the intrusion, the greater must be the reason for conducting a search that results in such invasion."), *aff'd*, 538 F.2d 898 (5th Cir. 1976).

[8] Whether the search was a strip search is a mixed question of fact and law. While we accept factual concessions from parties as true, we are not bound by their concessions of law. *Butcher v. Commonwealth*, 298 Va. 392, 395 (2020) ("We do not permit litigants 'to define Virginia law by their concessions.'" (quoting *Daily Press, Inc. v. Commonwealth*, 285 Va. 447, 454 n.6 (2013))).

buttocks, through his underwear, to search Hubbard's "groin area." Officer Waterman immediately felt a "hard object" in Hubbard's bottom. Officer Waterman explained that he has made "a tremendous amount of arrests from people who have concealed an illegal narcotic in the area of their buttocks or down in their groin" and that concealing drugs in that area "was actually the most common way narcotics made their way into the jail."

Everything up to this point in the search was independently supported by the suspected drugs found in Hubbard's truck.[9] But then, officers looked into Hubbard's underwear. According to *Kidd*, "[l]ooking into . . . underwear for drugs" is at least a strip search. 38 Va. App. at 446. And, while looking into Hubbard's underwear, officers also visually inspected his anal area, and touched and probed his buttocks while trying to remove the item. *See Hughes*, 31 Va. App. at 455 (a "visual body cavity search extends to a visual inspection of the anal and genital areas," and a "'manual body cavity search' includes some degree of touching or probing of body cavities"). Under *Gilmore*, to continue the search by looking into Hubbard's underwear and attempting to remove the item, officers needed a "clear indication" that evidence was located within a suspect's body, and exigent circumstances must have existed. *Gilmore*, 27 Va. App. at 330-31. If these threshold criteria were met, we must consider whether the means and procedures used were reasonable under the Fourth Amendment. But we need not resolve whether a body "cavity" includes the area between a clamped-together posterior because whether the search was a strip search or something more intrusive, it needed to be supported by exigent

_____

[9] Because we find the search to this point was supported by the suspected drugs found in Hubbard's vehicle, we do not consider whether a waiver of Fourth Amendment rights in a plea agreement alone would permit an officer to unbutton a person's shorts and swipe his buttocks through his underwear. *See Butcher*, 298 Va. at 396 ("[T]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" (quoting *Commonwealth v. White*, 293 Va. 411, 419 (2017))).

- 14 -

circumstances, and the facts developed below did not support any subcategory of invasive search.

### 2. *Officers had a clear indication that drugs were present.*

We agree with the trial court's conclusion that officers had a "clear indication" that the hard object in Hubbard's bottom contained illegal drugs. Before searching Hubbard, officers found bags of white and brown powders that were "knotted up" and appeared to contain illegal drugs. The car also smelled of marijuana, and there was visible marijuana shake in the vehicle.[10] While searching Hubbard, officers found about $2,000 in Hubbard's pockets. In combination, these factors clear this first hurdle.

### 3. *There were no exigent circumstances given the evidence presented below.*

Next, we must consider whether exigent circumstances existed to permit the invasive search to take place. Officer Waterman testified that Hubbard (who was handcuffed with his hands behind his back) was "trying to reach down into the back of his shorts, making it obvious that he's trying to get the item out of his shorts." He said his "main concern is that somebody could get hurt having an item down near their butt. He could shake it out of his shorts' pant leg at any time. He could stomp it out. He could kick it." Indeed, during the pause in the search, an officer saw Hubbard shake his leg as if he were trying to remove the item. Officer Waterman testified that he was concerned that the drugs in Hubbard's buttocks could have been fentanyl and if "he had stomped it out and a gust of wind would have came by, it could have killed all of us." He explained that widespread concerns about fentanyl led to a new internal policy that they were no longer to "open up bags of white powder for the purposes of a field test" because "[f]entanyl has become so dangerous in today's time that a simple poof of that powder that could

---

[10] The search occurred in June 2020 prior to the enactment of Code § 4.1-1302, which states that no officer may search any person "solely on the basis of the odor of marijuana."

- 15 -

reach our nostrils could kill us." Defense counsel argued below that there was no concern about destruction of evidence because "[h]e's surrounded by people" and "[i]f he wiggles it out of his pant leg," the officers "are watching him the entire time . . . [w]here is it going to go?"

The trial court concluded exigent circumstances were present because of the fear of fentanyl. Finding that "with fentanyl being the dangerous and harmful substance that it is, not only to those that are using it and transporting it without a license to do so, it certainly is dangerous to any officer that is exposed to it in any sort of manner" and "[t]hat, in and of itself, constitutes an [exigent] circumstance."

We start by noting that "[t]he burden of justifying the warrantless search below was the Commonwealth's." *Parady*, 78 Va. App. at 37. "[A] finding of exigency must arise from the evidence/information possessed by the officers and not mere speculation based on what may be theoretically possible." *White v. Commonwealth*, 73 Va. App. 535, 556 (2021). Indeed, "[b]ehind every closed door exists the theoretical possibility of an exigent circumstance" but "to find that such speculation could establish exigency effectively would, for the most part, read the warrant requirement out of the Fourth Amendment." *Id.* For this reason, "a finding of exigency must be tied to actual information about present circumstances and not mere theorizing." *Id.*

That officers had a clear indication Hubbard may have drugs concealed in his bottom does not lead to the inference that the specific substance was fentanyl. On this record, there is no "actual information" in the testimony or body camera footage that ties the hard object in Hubbard's buttocks to something more than a "theoretical possibility" about fentanyl. *See White*, 73 Va. App. at 556. Nor could anecdotal evidence that there is a lot of fentanyl in circulation amount to "actual information" creating an exigent circumstance. Thus, while

- 16 -

fentanyl may be dangerous, harmful, and more present than it used to be, the mere chance that fentanyl could be lurking around the corner is not an exigent circumstance.[11]

In reaching this conclusion, we reject only the trial court's conclusion that the theoretical possibility that a dangerous drug like fentanyl is present is "in and of itself" an exigent circumstance that constitutes a per se exception to the warrant requirement. Here, we are bolstered by the Supreme Court's rejection of a similar categorical rule that the natural dissipation of a blood alcohol level in a person's blood stream automatically created exigent circumstances justifying a warrantless blood test. *Missouri v. McNeely*, 569 U.S. 141, 152 (2013). While the Court acknowledged that "some circumstances will make obtaining a warrant impractical such that the dissipation of alcohol from the bloodstream will support an exigency justifying a properly conducted warrantless blood test," it nevertheless concluded that a "careful case-by-case assessment of exigency" was required to avoid the "'considerable overgeneralization' that a *per se* rule would reflect." *Id.* at 152-53 (quoting *Richards v. Wisconsin*, 520 U.S. 385, 393 (1997)). Thus, we underscore that while there may be future cases where a specific concern about the presence of fentanyl could create an exigent circumstance justifying an intrusive search, the Commonwealth did not put on sufficient evidence to suggest that this was a risk in this specific case.

---

[11] Other courts that have faced this question have reached the same conclusion. *See United States v. Fisher*, No. CR 23-01-M-DLC, 2023 U.S. Dist. LEXIS 95924, at *23-24 (D. Mont. June 1, 2023) (holding that the government failed to meet its "burden of showing specific and articulable facts" supporting exigent circumstances even if it was "objectively reasonable to have serious safety concerns about fentanyl, a particularly deadly drug even in small doses, being present in a house with young children"); *United States v. Marion*, No. 8:19-cr-555, 2021 U.S. Dist. LEXIS 176384, at *13-14 (M.D. Fla. Aug. 13, 2021) (While testimony established that "fentanyl is highly lethal even in small doses," that the officer suspected a given powder was fentanyl, and that "the quantity of fentanyl found in Defendant's shopping bag presented a danger of harm to the public if it fell into the hands of a third party," the government failed to show exigent circumstances without testimony "that the officers were unable to safeguard the shopping bag while seeking a search warrant.").

While the trial court focused only on the danger of fentanyl in its ruling, the Commonwealth also argued below that exigency was supported by a more general concern that Hubbard might shake out and destroy the evidence. Indeed, Officer Waterman presented a buffet of hypothetical exigencies such that Hubbard could "get hurt having an item down near [his] butt," or that he could "shake it out of his shorts' pant leg at any time" and "kick it," as well as the risk that might befall the officer if fentanyl was involved. If the facts support a finding of exigency based on these other theories, we may affirm the trial court's result, even though we disagree with the finding of exigency based on the danger of fentanyl. We are mindful, however, that we can only "apply the 'right result for the wrong reason doctrine' if 'evidence in the record' supports a different argument on appeal and 'the development of additional facts is not necessary.'" *Parady*, 78 Va. App. at 37 (quoting *Perry v. Commonwealth*, 280 Va. 572, 579 (2010)).

It is true that we have recognized an "emergency aid exception" to warrantless searches of a home, permitting an officer to enter and investigate contingent on "an [officer having an] objectively reasonable basis for believing that someone in the residence needs immediate aid." *McCarthy v. Commonwealth*, 73 Va. App. 630, 642 (2021) (citing *Michigan v. Fisher*, 558 U.S. 45, 47 (2009) (per curiam)). Perhaps this doctrine could be logically extended to apply if an object lodged inside a person presented a serious risk to the person's health and safety. Even if so, there was not enough evidence presented here, however, to allow us to conclude that a reasonable officer would be concerned for Hubbard's health and safety. The evidence shows that Hubbard was standing by his vehicle, not in any physical distress. And Officer Waterman repeatedly testified that the object was between Hubbard's clenched buttocks and not further up inside his body. Because additional facts would need to have been developed below to support a theory of emergency aid, we cannot apply the right result wrong reason doctrine.

- 18 -

The same is true of the evidence-destruction concern. While "[n]o fixed legal definition fully captures the meaning of exigent circumstances," *Evans v. Commonwealth*, 290 Va. 277, 283 (2015), we have relied on "a non-exhaustive list of considerations to inform a reviewing court's analysis of whether exigent circumstances are present," *White*, 73 Va. App. at 554. A reviewing court should consider:

> (1) the degree of urgency involved and the time required to get a warrant; (2) the officers' reasonable belief that contraband is about to be removed or destroyed; (3) the possibility of danger to others, including police officers left to guard the site; (4) information that the possessors of the contraband are aware that the police may be on their trail; (5) whether the offense is serious, or involves violence; (6) whether officers reasonably believe the suspects are armed; (7) whether there is, at the time of entry, a clear showing of probable cause; (8) whether the officers have strong reason to believe the suspects are actually present in the premises; (9) the likelihood of escape if the suspects are not swiftly apprehended; and (10) the suspects' recent entry into the premises after hot pursuit.

*Verez v. Commonwealth*, 230 Va. 405, 410-11 (1985).[12]

Here, we can start to review these factors but ultimately cannot complete the analysis without additional facts that were not presented or developed below. For example, we have testimony that officers believed Hubbard was trying to shake out the hard object that was in his bottom. At this point, Hubbard was already handcuffed and the rest of his body and vehicle had been searched. His companion was also handcuffed. Neither was armed, and, given their close proximity to the three police officers at the scene, neither could flee. Putting aside the general fear of fentanyl addressed above, no testimony or evidence suggests why—if Hubbard

---

[12] While these factors were first identified as relevant to exigent circumstances justifying a warrantless entry into a home, we have relied on them to review the existence of exigent circumstances more broadly. *See, e.g.*, *Moreno v. Commonwealth*, 73 Va. App. 267, 276 (2021) (applying the factors to conclude that exigent circumstances existed to justify obtaining cell site location information from a phone); *Moore*, 69 Va. App. at 37, 40-41 (applying the factors to find that exigent circumstances existed to justify the warrantless seizure of a firearm in plain view inside a vehicle).

successfully shook the hard object out of his shorts—one of the three officers on the scene could not have grabbed it. Indeed, as Hubbard's attorney argued below, "[h]e's surrounded by people" and even "[i]f he wiggles it out of his pant leg," the officers "are watching him the entire time . . . [w]here is it going to go?"

More critically, there was no evidence about the time it would have taken for officers to get a warrant. Addressing the concerns posed by the "degree of urgency involved and the time required to get a warrant" factor from *Verez*, we have said that "[p]roperly understood, the urgency inquiry is focused on whether there is an emergency situation, such as . . . the destruction of evidence, that likely will worsen if the officers take the time necessary to get a warrant." *White*, 73 Va. App. at 556. "To the extent it appears that there is no imminent change to the circumstances about to occur and that the status quo largely can be maintained while the officers seek a warrant, the situation is not 'urgent' for the purposes of an exigency analysis." *Id.* at 556-57. *See also McNeely*, 569 U.S. at 152 ("In those drunk-driving investigations where police officers can reasonably obtain a warrant before a blood sample can be drawn without significantly undermining the efficacy of the search, the Fourth Amendment mandates that they do so."). Without any evidence about how long it would have taken to get a warrant, or why officers could not maintain the status quo in that interim period,[13] we cannot affirm the trial court for this different reason.

Ultimately, we are constrained to hold that the Commonwealth did not present enough evidence below to establish that the invasive search was justified by exigent circumstances, thus satisfying the heightened Fourth Amendment standard. Because we find that this second prong of the *Gilmore* test was not met, we need not decide whether the third requirement—that the

---

[13] Demonstrating that warrants can often be obtained quickly and by telephone, the trial court even remarked, "I certainly have been the recipient of phone calls for search warrants in the middle of the night for things being introduced to people's body cavities."

means and procedures used to obtain the item were reasonable under the Fourth Amendment—was satisfied here.

CONCLUSION

For these reasons, we hold that the evidence should have been suppressed. Because we reverse the trial court's judgment on this basis, we do not consider Hubbard's other assignment of error about the chain of custody for the drug evidence admitted at trial. We vacate Hubbard's conviction and remand the case for a new trial if the Commonwealth be so advised.

*Reversed and remanded.*